State v. Duncan.

## THE STATE v. DUNCAN, *Appellant.*

### Division Two, May 30, 1893.

1. **Criminal Practice**: SPECIAL PROSECUTING OFFICER: STATUTE. The trial court, under Revised Statutes, 1889, sec. 643, is authorized to appoint an attorney to represent the state in a criminal case where the regular prosecuting officer is sick or absent.

2. ———: ———. The court, moreover, has the inherent power, irrespective of any statutory authority, to appoint a temporary representative of the state, if there be no prosecuting officer in attendance on the trial of a criminal cause.

3. ———: ———. The fact that, in the absence of the prosecuting officer, the trial court permits an attorney to represent him is equivalent to his appointment.

4. **Criminal Practice**: INDICTMENT. Objections to an indictment cannot be made *ore tenus.*

5. ———: BILL OF EXCEPTIONS: AFFIDAVITS. Affidavits of what occurred in the presence of the court cannot be made to perform the office of a bill of exceptions.

6. ———: ———: OBJECTIONABLE REMARKS OF ATTORNEY. Objectionable remarks of an attorney should be preserved in the bill of exceptions.

7. ———: ———. The preservation in the bill of exceptions of a mere statement of defendant's counsel is insufficient to prove that during the trial and while testifying the defendant was attended by an armed guard.

State v. Duncan.

8. **Criminal Practice:** DEFENDANT IN CUSTODY OF ARMED GUARD. There is no error in a trial court directing a defendant charged with murder in the first degree to be attended by an armed guard during the trial and while testifying.

9. ———: IMPANELING JURY: MOTION FOR NEW TRIAL. Error in the impaneling of a jury should appear from the bill of exceptions and the recital of it in the motion of a new trial is insufficient.

10. ———: OBJECTION TO EVIDENCE: RECESS OF COURT. Objections made to evidence during the recess of the court will not be considered.

11. ———: EXHIBITION OF REVOLVER. On a trial for murder, the defendant is not harmed by the exhibition of a revolver on the table of counsel before it has been called for.

12. ——— EVIDENCE: RES GESTÆ. A remark made immediately following the homicide by a bystander to an officer that "there is the man that did it," is competent as part of the *res gestæ* on the trial of the person so designated, for murder.

13. ———: NON-OPINION EVIDENCE. A witness having testified that he saw an act done may be asked if he has any doubt as to its comission as he has described it, the question not calling for an opinion but merely seeking to learn if the witness is firm in his conviction of having seen the act done.

14. ———: EVIDENCE: ESCAPE. It is competent to show that a defendant while in jail had saws in his shoes with which to make his escape in case of conviction.

15. ———: ———: CROSS-EXAMINATION. Where a witness on cross-examination avoids replying and parries a question by asking another he may be pressed for an answer and opposing counsel should not be permitted to interpose frivolous objections to rapid cross-examination, thereby affording the witness opportunity to fabricate replies.

16. ———: ———: HEARSAY. Evidence on a trial for murder that a person other than defendant admitted doing some shooting at the time and place of the homicide, is hearsay and inadmissible.

17. **Murder in First Degree:** EVIDENCE: VERDICT. A verdict finding the defendant guilty of murder in the first degree *held,* supported by the evidence.

18. **Manslaughter:** SELF DEFENSE. Where the defendant's theory is, that he killed an officer while resisting an unlawful arrest, he is not entitled to an instruction on manslaughter, but only to one as to self defense.

*Appeal from St. Louis County Circuit Court.*—HON.
W. W. EDWARDS, Judge.

AFFIRMED.

ON change of venue to the circuit court of St.
Louis county, the defendant, a negro, was convicted
of having murdered James Brady, a policeman, in the
city of St. Louis, by shooting him with a revolver.   In
conformity with the verdict the defendant was sen-
tenced, judgment accordingly and he appeals to this
court.

The homicide occurred October 6, 1890, in a
saloon at 715 North 11th street, kept by Charles Stark,
a negro, and mostly frequented by that race.   On the
evening in question about 8.30 o'clock, a large crowd,
principally negroes, was assembled on the sidewalk in
front of the saloon and by doing so obstructed the
passage not only of the sidewalk, but also of the street
up to the car-track.   The crowd was gathered together,
it seems, to witness a sparring going on between Luther
Duncan, a brother of defendant, who kept a barber
shop next to the saloon, and Bob Henderson another
negro barber.   Complaint being made to Policeman
Gafney who patrolled that beat, of the obstruction
thus caused, he hastened to the spot.   He was in full
uniform and well known to all the parties there.
On his arrival, he pushed his way through the crowd
and found the two negroes sparring, and the defendant
standing beside them.   As was his duty, he ordered
the crowd to disperse and told the sparrers to desist;
to move on and open a way on the side-walk for passers
by.   Speaking to Luther Duncan, who worked in a
barber shop close to the saloon, Gafney said: "You
know this will not do; go up there where you work,
and get the crowd up."   In response to this request,

Duncan put up his fists and shoved against the officer, who repeated his request, and said "If you don't go away I will have to take you away." Thereupon Luther Duncan replied: "You can go to hell; you can't take me away." When this remark was made, the crowd began closing in upon the speakers, and Gafney laid his hand on Luther's arm when defendant struck Gafney a violent blow in the face and eye. Then the Duncan brothers assisted by others set upon the officer, he was hustled through the crowd out into the street, receiving numerous kicks and blows, one of them in the stomach, a very painful blow, and finally his baton was wrested from him, and with this the Duncan brothers beat him over the head and left him lying unconscious on the street. During this fierce assault there were cries in the crowd of "Let's kill the son of a bitch while we are at it."

Recovering consciousness, Gafney rose to his feet and drawing his revolver fired twice in the air in order to attract the attention and secure the help of other officers in the vicinity. Just then Luther Duncan threw something at the officer and fled into Stark's saloon; Gafney followed him, but being weak from the treatment he had received, he was unable to open the door; but finally someone opened the door for him and he entered the saloon. Passing through the saloon he saw Luther in the billiard hall, which was a platform in the rear or west end of the room, some six or eight feet higher than the bar-room floor, and reached by two short stairways on each side of the saloon, one on the north and the other on the south. Gafney with revolver presented, went up the north stairway where Luther was standing, and approaching him said: "I want you." Upon this, Luther started to go with the officer, but when they had nearly reached the north stairway for the purpose of descending, a cry was

raised of "Don't shoot," and Gafney turning his head at the sound, received (from the defendant) a violent blow on the head. This blow was given with such force that it knocked Officer Gafney's hat off and sent him reeling and bleeding, with a great gash cut, over his eye and on his head, down the north stairway. Luther then disappeared.

On striking this blow, the defendant, who had not been seen by Gafney, sprang forward and wrenching the revolver out of Gafney's hand, went across the platform and started, pistol in hand, to descend the south stairway. At this juncture, attracted by the shots fired on the outside by Gafney, police officers Maloney and Conners, hastening from the adjoining beat, entered the saloon. As they did so, they saw Gafney staggering down the north stairway, his hat off and the blood streaming down his forehead and face, and he exclaimed to them that he was nearly killed. Just then, Starks, the proprietor of the saloon, who was immediately behind the defendant, pointed him out, and cried: "Here is the man who did it." Maloney who was in advance of Conners and moving across the center of the saloon, called out to defendant: "Throw up your hands, you are my prisoner." Defendant threw up the hand in which he held the pistol and retorting: "Yes, God damn you," fired two shots at Maloney and one at Conners, who was endeavoring to cut off defendant from darting behind the counter, which was on the south side of the saloon. When Maloney called on defendant to throw up his hands, neither he nor Conners had drawn their pistols. As defendant began firing at him, Maloney dropped to the floor, and then both he and Conners drew their pistols and began returning defendant's fire, who then managed to run behind the counter and crouch under it. Both officers then went up to the counter and

endeavored to cover the defendant with their weapons. The defendant occasionally sprang up from behind the counter and shot at the officers and they returned his fire and defendant instantly crouched again behind the counter.

About this time, officer Brady, of that beat, in full uniform, came into the saloon to assist in arresting defendant. He approached the counter, and as he did so and was alongside the other officers, defendant jumped up and fired at them, then Brady hallooed to defendant to "surrender." Defendant not doing this, Brady leaned over the counter and fired one shot at defendant, who was crouching behind it with nothing but his legs and feet exposed. Defendant thereupon sprang up, suddenly, shot Brady, who fell over dead, and at the same time Maloney and Conners fired at defendant and slightly wounded him in the side, and he immediately dropped again behind the counter. The attention of the officers was then engaged in looking after their dead companion. Pretty soon Conners discovered the defendant slipping around the west end of the counter having a pistol in his hand, and covering him at once with his own revolver, said: "You make a move with that gun and I will kill you." Defendant replied: "Stop where you are." Conners said: "If you raise that gun I will kill you." Defendant then said: "I've killed one; I'm satisfied," and threw his pistol behind the counter and Conners then secured him and he was taken to the police station.

The next morning defendant was taken to the office of the police captain at the station; when asked by the captain, "What have you got to say about this trouble last night?" in answer stated: "I was in the saloon, and Gafney was chasing my brother into the saloon; just as they reached the head of the steps of the billiard hall I knocked Gafney down with the bil-

liard cue; Gafney had his gun in his hands; I took his gun away from him; I started to go out of the saloon; as I went down the steps, some other officers came in with guns in their hands; I shot at them and ran behind the counter; they were shooting at me, and then Brady came in; he leaned over the bar and was trying to shoot me, when I raised up from behind the bar and shot Brady; I shot him with the gun I took away from Gafney; I had no other gun." These admissions or confessions were testified to by several police officers.

When defendant was taken from St. Louis to Clayton for trial, several small steel saws were found concealed in one of his slippers, wrapped in a cloth, and these were shown to the jury. This was the substance of the evidence offered on behalf of the prosecution.

On behalf of the defendant, the testimony was to this effect: The crowd in front of Stark's was attracted by a talking parrot. The trouble between Luther Duncan and Henderson was slight, and was all over when Gafney came. Neither of the Duncan boys was doing anything at the time, but Gafney assaulted them first. Defendant defended himself with his fist, and then both went into the saloon. Gafney followed them in a little afterward, with a pistol in hand, and, pointing it at defendant, said: "You black son-of-a-bitch, I'll blow your head off!" Defendant, to save himself, knocked the officer down with a billiard cue, took the pistol from him, and started to leave the saloon. Maloney and Conners came in, with revolvers in hand, and opened fire upon defendant at once and without a word. He fired at each of them once, and exhausted the chambers. He threw up his hands in token of surrender, but the officers continued shooting at him. He ran behind the counter and crawled under it, and while there was shot twice by the officers, leaning over. He

remained crouched there until the shooting was all over, when Stark called to him to come out and surrender, which he did. He saw Brady come in as he ran behind the counter, but did not shoot at him. He did not rise from behind the counter at any time, until he surrendered. Defendant denied ever having made any admission to the officers, or to any one else.

One witness for the defense testified that Stark fired two shots at Brady, one of which killed him. Another witness testified that Stark did not fire any shot at all, but pointed a pistol at defendant after Brady was shot, and ordered him to surrender and throw up his hands. Some of defendant's witnesses testified that Officers Maloney and Conners fired the first shots at defendant; but two of the latter's witnesses, McClellan and Thomas testified that defendant fired the first two shots at those officers.

Defendant admitted his possession of the saws, that he brought them with him from the St. Louis jail, but said he did not intend to use them unless he were convicted.

And at the close of the evidence the following instructions were given by the court at the instance of the state and of the defendant:

"(1) If you believe and find from the evidence that the defendant in the city of St. Louis and at any time prior to the finding of the indictment with a pistol shot and killed James Brady and that he did such shooting and killing feloniously, willfully, premeditatedly, deliberately and of his malice aforethought, you will find him guilty of murder in the first degree. And unless you so believe and find, you should acquit him of murder in the first degree.

"Feloniously means wickedly and against the admonition of the law.

"Willfuly means intentionally, and not done by accident.

"Premeditatedly means thought of beforehand, for any length of time, however short.

"Deliberation means done in a cool state of the blood, and not done in a sudden passion engendered by a lawful or some just cause of provocation.

"(2) By the indictment the defendant stands charged with murder in the first degree. To this charge he pleads not guilty, thereby raising an issue of fact between him and the state, which you, the jury, must determine by the evidence. In connection with which the court instructs you as follows:

"(3) By the term malice is meant that condition of the mind which prompts one to take the life of another without legal justification or excuse. This is its legal meaning, and not mere spite, ill will or hatred, the sense in which the term malice is commonly understood. And by malice aforethought is meant that the act of killing which this condition of mind prompts one to commit must have been premeditated.

"To constitute a homicide a murder in the first degree, it must contain all the elements of willfulness, premeditation, deliberation and malice aforethought, as these terms are heretofore defined, and the state must prove their existence beyond a reasonable doubt; but their existence may be inferred from the facts and circumstances connected with the killing. And if they did exist a moment before the killing it is as sufficient as if they existed a week or month.

"(4) In order to convict the defendant of murder in the first degree you must believe from the evidence that the defendant shot James Brady intending to kill him. In this connection, however, you are instructed that in the absence of qualifying circumstances and facts, a person is presumed to have intended the

natural, ordinary and probable result of his acts. Wherefore, if you believe from the evidence that the defendant intentionally shot James Brady in a vital part with a deadly weapon, to-wit: a pistol, from which death ensued, you will find that he intended to kill, unless the facts and circumstances given in evidence show to the contrary.

"(5) If you find the defendant guilty of murder in the first degree you will merely say so in your verdict. To the court belongs the duty and responsibility of affixing the punishment the law provides for this crime.

"(6) The court instructs the jury that if they believe from the evidence that prior to the death of the deceased, James Brady, the defendant had committed an assault upon officer Gafney, then it was the right and duty under the law of such officer to arrest the defendant for such offense; and if the jury believe from the evidence that, while the officer was endeavoring to arrest the defendant, the latter assaulted him and struck him over the head with a billiard cue and was endeavoring to effect his escape after such striking; and if the jury believe from the evidence that officers Maloney and Conners were patrolmen, and members of the St. Louis police force and entered the premises where the said striking of Gafney had taken place and within a few moments after its occurrence, then it was the right and duty, under the law, of said Maloney and Conners to arrest the defendant for said assault so committed, and it was the duty of the defendant to surrender himself without resistance to said officers upon their endeavoring to subject him to such arrest; and if the jury believe from the evidence that being in the uniform of his office as a policeman Officer Maloney ordered defendant to hold up his hands, and stated to him at the time that he, defendant, was his, the officer's,

prisoner, then such words of the officer constituted in law an arrest of the defendant to which it was his duty to submit; and if the jury believe from the evidence that instead of submitting peacefully to arrest as herein defined the defendant resisted; and if the jury believe from the evidence that the deceased, James Brady, was a police officer and in the discharge of his duty was assisting his brother officers in overcoming the resistance of said defendant, when he, said Brady, was killed, then such assistance was lawful on the part of said Brady even to the extent, if necessary, of taking the life of the defendant; and if the jury believe from the evidence, that in the course of resistance to arrest, forcibly made by defendant, and in order to avoid arrest, he did, willfully, intentionally, premeditatedly and maliciously shoot and kill the deceased, James Brady, then such killing was murder in the first degree on the part of the defendant, and the jury will find him guilty in manner and form as charged in the indictment.

"(7) If the jury believe from the evidence that any witness has willfully sworn falsely to any material fact in his testimony, they are at liberty to reject and disregard the entire evidence of such witness.

"(8) The jurors will sign, by their foreman, one of the following forms of verdict:

'We the jury find the defendant, Harrison Duncan, guilty of murder in the first degree, as charged in the indictment;' or, 'We the jury find the defendant, Harrison Duncan, guilty of murder in the second degree, and assess his punishment at        years' imprisonment in the state penitentiary;' or, 'We the jury find the defendant, Harrison Duncan, not guilty.' "

For defendant:

"(1) The court instructs the jury that if they believe from the evidence that the defendant, Harry Duncan, was standing on the sidewalk in front of or

near Stark's saloon at 715 North Eleventh street, in the city of St. Louis, Missouri, on the night of the sixth of October, 1890, and that he was acting in a quiet and peaceable manner, and that he was assaulted, shoved or struck by the policeman, Gafney, then he, defendant, had the right in law to resist said assault or battery by such means and in such manner as was necessary to repel his assailant.

"And the jury are instructed that said Gafney, although a police officer of said city of St. Louis with authority to make arrests for offenses against the law, had no right to assault or beat or strike or shove the defendant Duncan, if he, the defendant, was conducting himself in a peaceable and law abiding manner.

"And the jury are further instructed, that the defendant, after resisting the assault of said Gafney, had a lawful right to go away and to abandon the difficulty, and if the jury believe from the evidence, that the defendant did so go away, and did abandon the said difficulty, then the said Gafney had no legal right to follow or pursue him into the said Stark's saloon and arrest him.

"And if the jury believe from the evidence that said Gafney did follow and pursue the defendant, Duncan, into the said saloon and did again assault defendant at the top of the stairway leading up to the billiard hall, or if from the conduct and actions of the said Gafney, the defendant had reasonable ground to apprehend great danger or bodily harm from him or to fear another assault from said Gafney, then the defendant had the right to defend himself from said threatened assault, or to repel any such assault by the use of such force as might be necessary, even to the taking of life.

"(2) And the jury are further instructed that under the law, a police officer in the city of St. Louis,

has no right, power or authority to compel any person who is standing upon a public street or highway, in a quiet and peaceable attitude, to move or to go away at the bidding of the said officer, or to do his mere bidding and that the officer, upon such person failing or refusing in a peaceable way to obey him, has no right whatever to assault, beat or strike such person, and such person has the right to resist force by force, meet violence with violence, and to use all the means necessary to preserve his life, or to prevent great bodily harm from being inflicted upon him, even to the extent of taking the life of his assailant, whether he be an officer or private citizen.

"And if the jury further believe from the evidence, that the defendant Duncan, after the second difficulty with officer Gafney at the top of the stairs in Stark's billiard room, then in good faith abandoned said conflict, and retreated down the stairway and behind the counter in the saloon, and there laid down and hid, and that while the defendant was lying hidden behind said counter, the said officers Maloney and Conners, and the deceased, James Brady, assaulted him and shot at him and shot him, then the said defendant was justified in returning the fire, and in using all means and weapons necessary to protect his life, or to prevent great bodily harm to himself, even to the taking of life.

"And if the jury believe and find from the evidence, that the shooting was done under such circumstances and was necessary to the defense of the prisoner, then the verdict should be not guilty.

"(3) If the jury further believe from the evidence, that the defendant, Duncan, was standing upon the sidewalk, on Eleventh street near Stark's saloon, in the city of St. Louis, Missouri, on the night of the sixth of October, 1890, and that he was conducting

himself in a peaceable and quiet manner, and that the policeman, Gafney, ordered and commanded him to move on, or to move or to go away, and the defendant failed or refused to obey him, and that thereupon the said officer Gafney, assaulted the defendant, or struck him with his hand or with a club, or shoved him and that the defendant then struck said Gafney and knocked him down, then such act was in the nature of self defense on the part of the defendant, and is in law justifiable.

"And if the jury further believe from the evidence, that after the defendant, Duncan, had struck the said Gafney, he, the defendant, then endeavored in good faith to get away, and to abandon the said conflict that had taken place between him and the said Gafney, and ran into said saloon, and back to and up the stairs into the billiard hall; and further find from the evidence, that said Gafney pursued the defendant, and called other officers to his aid, and that Gafney and the other officers, including the deceased, James Brady, also entered said saloon where the defendant had retreated, and then and there attempted to shoot the defendant and arrest him, and that the defendant had reasonable grounds to apprehend great bodily harm or death at the hands of said officers, then he, the defendant, had the right to exercise the right of self defense, and to repel force by force and violence by violence, and to use such means and weapons as were necessary to defend his life or his person, even to the taking of the lives of his assailant or assailants.

"And if the jury believe, and find from the evidence, that the shooting was done under such circumstances and was necessary for the self defense of the prisoner, then he is entitled to an acquittal.

"(4) Under the law of this state, the defendant is presumed to be innocent of the crime charged in the

indictment, until he is proven guilty thereof, beyond all reasonable doubts, and the burden of proving the defendant's guilt devolves upon the state and the law clothes the defendant with such presumption of innocence, which attends and protects him, until it is overcome by testimony which proves his guilt beyond a reasonable doubt, and such doubt must be based upon the evidence, or want of evidence in the case.

"(5) The court declares the law to be, that the fact that the defendant is indicted for a heinous offense, in this case, is no evidence whatever of his guilt, and that fact must not be considered by the jury, as against the defendant, in determining his guilt or innocence of the crime charged against him.

"(6) The court instructs the jury that a party may defend himself by taking life, whether his danger is real or not, if the danger is apparently so imminent and pressing that a prudent man might suppose himself in such peril as to deem the taking of the life of his assailant necessary to self preservation.

"(7) The jury are further instructed that if they find from the evidence, that there is a conflict in the evidence, as to who fired the shot that killed James Brady, and that the jury are not convinced from the evidence to a moral certainty, that defendant fired said fatal shot, then they should find him not guilty.

"(8) The jury are further instructed that if they find from a consideration of all the evidence in the case, that it points as clearly to one Charles Stark, or to some other person, as the person who fired the fatal shot, or committed the crime in question, as it does to the defendant, Duncan, or if, after a fair and full consideration of all of the evidence, the jury entertain or have a reasonable doubt as to whether the said defendant Duncan, or the said Charles Stark, or some one else

is the guilty party, then the jury should find the defendant not guilty.

"(9) The jury are instructed that although they may believe from the evidence that the deceased, James Brady, was killed at the time and in the manner mentioned in the indictment, and that the shot that caused his death was fired by the defendant, or by one Charles Stark, or by some one else, still, if the jury are unable from the evidence to determine by which of said persons or by whom the shot was fired, then the jury should consider the case precisely the same as though it had been proved that some other person other than the defendant, fired the fatal shot, and therefore, should find the defendant not guilty.

"(10) The jury are instructed that if they find from the evidence in this case, that all the criminating circumstances relied upon by the state for a conviction, will as well apply to some other person as to the defendant, or, if they are reconcilable with any reasonable hypothesis, other than that of defendant's guilt, or if they do not satisfy the mind of the jury, beyond a reasonable doubt, of the guilt of the defendant, then he cannot be legally convicted and you must acquit him.

"(11) The court instructs the jury that a brother has a right to defend a brother, when his brother is threatened with a deadly or dangerous assault, or with a deadly weapon, or if he has reasonable or good ground to apprehend great bodily harm or death to his brother from his assailant.

"(12) By reasonable doubt, as used in the instructions, is meant a substantial doubt existing in the minds of the jurors as to the guilt or innocence of the defendant after a consideration of all the evidence in the case, and not a mere possibility of innocence.

"(13) The court declares the law to be that if the jury find and believe from the evidence, that the

defendant, at the city of St. Louis, Missouri, on or about the sixth day of October, 1890, shot and killed the deceased, James Brady, in the manner and by the means specified in the indictment, and if the jury further believe, from the evidence, that such killing was done willfully, premeditatedly and with malice aforethought (as defined in the instructions herein) but without deliberation (as defined) then the jury will find the defendant guilty of murder in the second degree.

"(14) The jury are instructed that the punishment for the crime of murder in the second degree, is imprisonment in the penitentiary for a period of not less than ten years, and if the jury should find the defendant guilty of such offense, they will assess the term of his punishment in their verdict."

*W. Farmer* and *G. W. Royse* for appellant.

(1) The court should have excused from the panel of forty the jurors August Roesen, Fred Hintertheur and John J. Braun, who by all the rules of law were not competent to sit on the case as they had well-defined, fixed opinions which it would take very strong testimony to remove. *State v. Cutler*, 82 Mo. 623; Revised Statutes, 1889, sec. 4197; *State v. Burgess*, 78 Mo. 234; *State v. Hopkirk* 84 Mo. 278; *State v. Wilson*, 85 Mo. 134; *State v. Bryant*, 93 Mo. 273. (2) The court committed error in permitting the case to be tried in the absence of the regular prosecuting officer and in permitting it to be prosecuted by Judge Krum who was employed by the police force of the city of St. Louis. *State v. Sweeney*, 93 Mo. 38; *State v. Griffin*, 87 Mo. 603; *State v. Hamilton*, 65 Mo. 520; *State v. Stark*, 72 Mo. 37. (3) The court erred in

allowing Officer King to exhibit to the jury a certain pistol in his possession and which was not shown to be the pistol with which the deceased was killed, and with which pistol defendant was in nowise shown to be connected. *State v. Thomas*, 99 Mo. 235; *State v. Mix*, 15 Mo. 153; *State v. Marshall*, 36 Mo. 400; *State v. Daubert*, 42 Mo. 242. (4) The court erred to the irremediable prejudice of defendant in permitting an armed guard to sit by defendant in court during the progress of the trial. *State v. Kring*, 64 Mo. 591. (5) The court erred in instructing the jury under the evidence, in this case, as to murder in the first degree. (6) It is the duty of the court, in criminal cases to instruct the jury upon all phases of the case, whether the instructions are asked for or not. *State v. Branstetter*, 65 Mo. 149; *State v. Gassert*, 65 Mo. 352; *State v. Little*, 67 Mo. 624; 57 Mo. 131; 62 Mo. 597; 64 Mo. 107. (7) The court under the evidence should have instructed on manslaughter in third and fourth degrees. (8) The court erred in rejecting the evidence of Jeff Tyler and Wm. B. Bailey, as to statements of Charles Stark, to the effect that he did some shooting himself, at time Brady was killed. (9) Under the evidence and the law of this case the verdict of the jury is clearly wrong, and should not be upheld, as it is clear that the defendant could not have committed the act imputed to him, for various reasons apparent from a careful inspection of the record in this case.

*R. F. Walker*, attorney general, and *C. O. Bishop*, assistant circuit attorney, for the state.

(1) The indictment is in all respects sufficient. *State v. Turlington*, 102 Mo. 642. An indictment for murder in the first degree in the usual form is sufficient

in a case where a person is charged with killing an officer. *State v. Green*, 66 Mo. 631. (2) The objection based upon the absence of the circuit attorney was voluntarily withdrawn, and no exception to any action of the court was preserved. Conceding for argument's sake that defendant had a statutory right to be prosecuted only by the state's officer, yet he may waive any statutory right. *State v. Klinger*, 46 Mo. 224; *State v. Waters*, 62 Mo. 196; *State v. Gilmore*, 95 Mo. 554; *State v. Keele*, 105 Mo. 38, 42; 1 Bishop Criminal Procedure, secs. 118, 119; Revised Statutes, (1889) sec. 4115. (3) There is nothing in the bill of exceptions to show that Judge KRUM made the remarks attributed to him in the twentieth ground for new trial. The affidavits accompanying the motion are inefficient as exceptions. *State v. McDaniel*, 94 Mo. 301; *State v. Hays*, 81 Mo. 574; *State v. Pagels*, 92 Mo. 300; *State v. Taylor*, 98 Mo. 240; *State v. Bulling*, 105 Mo. 226; *State v. Musick*, 101 Mo. 260; *State v. Welsor*, 21 S. W. Rep. (Mo.) 443. (4) There is nothing in the record to show that an "armed" guard was stationed beside the defendant during the trial, or that such guard accompanied defendant to the witness-stand when he was sworn; the affidavit of the defendant filed with the motion for a new trial does not prove the point. *State v. McDaniel*, 94 Mo. 301; *State v. Musick*, 101 Mo. 260. (5) There is nothing in the record to sustain the allegations of the motion for new trial as to incompetent jurors. Motions for new trial do not prove themselves. *State v. Hultz*, 106 Mo. 41; *State v. Bulling*, 105 Mo. 204; *State v. McDaniel*, 94 Mo. 301. There was no error in overruling appellant's objection to the introduction of any evidence under the indictment. Objections to the sufficiency of an indictment can be taken only by motion to quash, demurrer or motion in arrest; not as in civil cases by

State v. Duncan.

objecting *ore tenus* to the introduction of evidence. *State v. Meyers*, 99 Mo. 107. " 'Flank movements' should not be encouraged." (SHERWOOD, J.) *State v. Risley*, 72 Mo. 609,611. (7) The verdict of the jury is fully sustained by the evidence. (8) The instructions given in the case correctly declared the law and were highly favorable to defendant. There was no evidence authorizing an instruction on manslaughter. *State v. Dunn*, 80 Mo. 681.

SHERWOOD, J.—I. If there was any error in the court permitting the Hon. Chester H. Krum to prosecute on the part of the state, such error cannot avail the defendant, because he distinctly waived any such objection and saved no exception to the substitution mentioned. Besides, under the provisions of section 643, Revised Statutes, 1889, the court had the power to appoint an attorney to represent the state in the case of the sickness or absence, as was the case here, of the regular prosecuting officer. Moreover, aside from statutory provisions, there exists an inherent power in a court, if there be no prosecuting officer in attendance, to appoint a temporary representative of the state. *State v. Moxley*, 102 Mo. *loc. cit.* 384, and cases cited. And the fact that in the absence of the circuit attorney, the trial court permitted another to represent him, was tantamount to an appointment.

II. The indictment in this cause is in usual form, and would be unobjectionable, even against a demurrer or motion in arrest, and even were it not thus free from flaw, objection could not be taken to it, as was here attempted, *ore tenus*. *State v. Risley*, 72 Mo. 609; *State v. Meyers*, 99 Mo. 107. For this reason the objection made by the defendant to the introduction of any evidence because of the insufficiency of the indictment was, consequently, untenable.

III.   The only way a party can take advantage of an error occurring during the progress of the trial is by properly excepting; presenting the point in his motion for a new trial, and when that is overruled, saving the point in his bill of exceptions.  Affidavits of what occurred in the presence of the court cannot usurp the province or function of a bill of exceptions, nor save matters which can only be preserved in such bill.  *State v. Hayes*, 81 Mo. 574; *State v. Musick*, 101 Mo. 260.

The objectionable remarks alleged to have been made by Judge Krum in his opening statement, and in his concluding argument, not having been preserved in the manner above noted, are not legitimate subjects of comment in this court, since the affidavits offered to prove such remarks are no evidence that such remarks were made.  *State v. Welsor*, 21 S. W. Rep. 443, and cases cited.

IV. Contention is made that error occurred in permitting an armed guard to be stationed by the defendant "during the entire trial, and during the time he was testifying."   There is nothing of the kind preserved in the bill of exceptions to show that such objection was taken until the *third* day of the trial, when the defendant was the last witness examined. There was no force in the objection, even if an "armed" guard did constantly attend the defendant during the trial and while he was testifying.  Certainly the mere *statement* of defendant's counsel preserved in the bill of exceptions does not prove the existence of the fact.   But, if it did, there was nothing improper in an armed guard keeping watch over a defendant charged with murder in the first degree, and who, if much of the testimony heretofore recited is true, is a desperate and dangerous character.   Furthermore, it is competent for the court to direct in what manner a

prisoner when in court shall be kept. A prisoner is in the custody of the law when he enters the court room for trial, and some courts during that period order even a bailed prisoner into the charge of the sheriff. 1 Bishop on Criminal Proceedings, sec. 952a.

The same line of remark applies to an officer attending Newman, indicted for murder in the first degree, and brought into court to testify in behalf of defendant on *hab. corp. ad. testif.*

V. It is claimed that error occurred in impaneling the jury; that incompetent jurors were selected. There is no proof of this in the bill of exceptions, and the recital of it in the motion for new trial would not prove it; such motions do not prove themselves. *State v. Musick, supra; State v. Hayes, supra; State v. McDaniel,* 94 Mo. 301. Nor could the affidavits filed with the motion establish the truth of the statements the motion contains. *Ibid.*

VI. Certain errors in the admission of the evidence on the part of the state alleged to have occurred during the trial, will now be noticed.

*(a)* Objection was made during a *recess of court* that a revolver had been exhibited on the table of counsel for the state before it had been called for. This objection was invalid because of the *time* at which it was made, if for no other.

*(b)* But it was invalid in any event because it is always competent to exhibit to the jury by way of illustration, models, tools, weapons, implements, etc. This is everyday practice, and one that serves a very useful purpose. 1 Bishop on Criminal Proceedings, sec. 965, and cases cited.

*(c)* The objection, however, did not go to the *use* of the pistol *when* called for, but because it was there *before* that time. What harm the mere anticipatory

presence of the pistol on the table could do the cause of the defendant is very difficult to conceive.

*(d)* The remark made by Stark to officers Maloney. and Conners when pointing out the defendant, "there is the man that did it," was undoubtedly competent as part of the *res gestæ. State v. Gabriel*, 88 Mo. 631; *State v. Moxley*, 102 Mo. 374; 1 Bishop on Criminal Proceedings, sec. 1085; 1 Wharton on Evidence, sec. 259; *State v. Walker*, 78 Mo. 380.

*(e)* Maloney had stated in his examination-in-chief that he saw defendant rise from behind the bar and fire the fatal shot which killed Brady. The state then propounded this question to the witness: "Have you any doubt, Mr. Maloney, as to the fact of Duncan rising from behind that counter and delivering the shot as you have described it?" This question was objected to on the ground that it called for the *opinion* of the witness. This is a mistake; the question merely sought to ascertain of the witness if he was firm in his conviction of having seen defendant rise and shoot, and his answer was: "I have no doubt, for I saw him positive." Both question and answer were entirely legitimate.

*(f)* In *State v. Jackson*, 95 Mo. 623, it was ruled that evidence was admissible to show that a prisoner had requested another to secure tools so that he might effect his escape, and by parity of reasoning, evidence was competent to show that defendant had saws on his person in jail with the intent to make his escape in case of a conviction.

*(g)* Newman having testified in chief that it was Stark that killed Brady, was asked on cross-examination why it was that he had never disclosed to any one before the important fact that Stark was guilty and defendant innocent, although two years nearly had elapsed, etc., and when he avoided the question and evaded reply he was pressed for an answer, but would

only parry the question by asking others. The objection to pressing the witness in this way was not tenable. The very object of cross-examination is to sift the witness; to winnow out from his story the chaff of mistake and the tares of falsehood, leaving as the *residuum* nothing but the grains of original truth. When a witness is thus being sifted and tries to evade a legitimate question in the mode already mentioned, adverse counsel should not be permitted to interpose frivolous objections to rapid cross-examination, thereby affording the recalcitrant witness a breathing space and opportunity to fabricate some plausible reply.

(*h*) Evidence was wholly inadmissible that Starks had admitted that he "*had done some shooting there that night.*" This proposed evidence was the merest hearsay. Even had Stark directly admitted that he had killed Brady, evidence of such admission would still have been hearsay. *State v. Evans*, 55 Mo. 460.

VII. There was abundant evidence, if believed by the jury, to support the verdict of guilty of murder in the first degree, and then there are besides the confession made by the defendant, and his admission made to the officers when he came from behind the bar and was compelled to surrender.

VIII. It remains to discuss the instructions. They were those usually given as to murder in the first and second degrees, and instructions were given also on the theory of self-defense, which to say the least of them were very liberal indeed.

The seventh instruction as to the doctrine of *falsus in uno*, etc., was in usual form and correct and it was proper to give it as there was much conflict in the testimony which was irreconcileable with any theory except one which would justify the giving of such an instruction.

It is, however, insisted that instructions should have been given covering manslaughter in the third and fourth degrees.. There is no sound basis for such instructions presented by this record, and for these reasons: If the police officers were not endeavoring to arrest the defendant; were not acting in their official capacity as peace officers, then the defendant had the undoubted right to resist them and their unlawful assaults just in the same manner and to the same extent as those of a private individual. The law throws around an officer its *"special protection"* only while engaged in the performance of some official duty; not otherwise. *State v. Clayton,* 100 Mo. *loc. cit.* 521, and cases cited. If, then, the officer or officers were not honestly endeavoring to arrest the defendant, but were simply endeavoring to wreak their personal malice against him, then the instructions given on the theory of self-defense were all that defendant could of right demand. If, on the contrary, the defendant was only engaged in resisting lawful arrest, there was in legal contemplation no hot blood, none of the elements or conditions of manslaughter in the case; for, in such circumstances, "passion is wickedness and resistance crime."

After a careful examination of the record, discovering no error therein, we affirm the judgment and direct that the sentence of the law be carried into execution. All concur.