THE STATE ex rel. JOHN SCHMOLL v. JOHN W.
· DRABELLE et al., Constituting Board of Election
Commissioners of St. Louis.

In Banc, October 24, 1914.

1. STATUTE: Repealing Statute Unconstitutional. If an osten-
sible statute attempting to repeal certain sections of the Revised
Statutes is unconstitutional and void, those sections, upon an
adjudication that said repealing statute is void, are left in exist-
ence as live law.

2. UNCONSTITUTIONAL STATUTE: Blanket Ballot Law: Con-
stitutional Majority. A bill which failed to obtain a majority
of all the members elected to either house of the General As-
sembly, as shown by a count of the recorded vote in the journal
of that house, never became a law, although signed by the
presiding officer of each and approved by the Governor.

3. ————: ————: ————: Count: Members Voting Ay as
Shown by Journal. The Constitution (Sec. 31, art. 4) says
that "no bill shall become a law unless on its final passage
the vote be taken by yeas and nays, the names of members
voting for or against the same be entered on the journal, and
a majority of the members elected to each house be recorded
thereon as voting in its favor." Where, therefore, the whole
number of members of the House was 142, a constitutional ma-
jority being 72, and the journal of the House in which the
ayes and noes were recorded shows only 71 ayes for a certain
bill, that bill never became a law, although the journal recites
it had received a constitutional majority, and had been signed
by the presiding officers of the House and Senate and approved
by the Governor. All those constitutional requirements are
essential prerequisities to the validity of a law, and one is
just as essential as another; and since the Constitution says
that a majority of the members to each house shall be re-
corded on the journal as voting in its favor, unless the journal
shows that fact the bill never became a law. Nor can recitals
found. in the journal to the effect that the bill received a con-
stitutional majority be held to either dispute the recorded vote,
or to weaken its effect to the extent of introducing doubt or
uncertainty which would preclude courts from interfering.
Held, by GRAVES, J., dissenting, with whom WOODSON, J.,
concurs, that as the Constitution provides, in the same
article, that no bill shall become a law until the same
shall have been signed by the presiding officer, and that

before he shall affix his signature he shall suspend all other business, "declare that such bill will now be read, and that, if no objections be made, he will sign the same to the end that it may become a law," and that "if no objection be made" he shall, in the presence of the House, in open session, and before any other business is entertained, affix his signature, "which. fact shall be noted on the journal," and also provides that if any member shall object "that any particular clause of this article of the Constitution has been violated in its passage, such objection shall be passed upon by·the House, and if sustained, the presiding officer shall withhold his signature," and that when a bill shall have been so signed in both houses, and approved by the Governor, it "shall become a law," a bill which by the journals is shown to have been signed by the presiding officers of both houses without any objection having been made, and approved by the Governor, should be held to be a law, although a count of the ayes and noes as recorded in the journal of one house shows a majority of the members elected thereto did not vote in its favor; that no objection being offered is strong evidence that no objection in fact existed; and that the provision that any "such objection shall be passed upon by the house" means that it is for the legislative body to adjudicate the question of whether a bill has been constitutionally passed, and that the House, having in this case adjudicated that the bill was legally passed, as is shown by its journal record that it received a "constitutional majority," the court cannot go behind such adjudication.

*Held*, also, that a bill properly attested by the presiding officers of the two houses and approved by the Governor, cannot be impeached in a court by a resort to the journal of one of them. That is the positive trend of modern adjudications, and should certainly be the rule in this State in view of our constitutional provision that "such objection shall be passed upon by the house."

*Held*, also, that if the journal impeaches itself, one part showing the bill did pass and another that it did not receive the necessary constitutional majority, the courts cannot interfere, since the rule everywhere accepted is that if doubt exists as to whether a bill received the necessary number of ayes that doubt must be resolved in favor of the due attestation of the presiding officers and the approval of the Governor; and in this case, not only does the journal say that the bill "was passed" and the memoranda indorsed on the bill say that it was "duly passed," and those recitals are impeached by a count of the names of those voting "aye" recorded in the journal, which shows 72 "ayes" (a bare constitutional majority), whereas, by

counting the names only 71 are found to have so voted, but it also shows that one member is recorded as voting both "aye" and "no," and therefore the journal in the most positive way impeaches itself.

## Mandamus.

WRIT ALLOWED.

*Irwin & Peters* for relators.

*John. T. Barker*, Attorney-General, and *Lee B. Ewing*, Assistant Attorney-General, for respondents.

(1) It is necessary that a bill receive a majority of all the members of each house before the same can become a law. Sec. 31, art. 4, Constitution. (2) If the journal of the House of Representatives shows that this bill did not receive a constitutional majority, the same is invalid and never became effective as a law of this State. Sec. 31, art. 4, Constitution; State ex rel. v. Mead, 71 Mo. 266; State v. Ray, 109 Mo. 597; State ex rel. v. Field, 119 Mo. 593; Weyand v. Stover, 35 Kan. 545; People ex rel. v. McElroy, 72 Mich. 447; Speer v. Mayor, 85 Ga. 52; Jennings v. Russell, 92 Ala. 603; Cooley's Constitutional Limitations (5 Ed.), 164-168. (3) Parol evidence is not admissible to contradict the entries in the journal of the House of Representatives. Light & Water Co. v. Lebanon, 163 Mo. 259; Ball v. Fagg, 67 Mo. 484; State v. Wendler, 94 Wis. 369. (4) The Constitution requires the aye and nay votes upon the passage of all laws to be recorded on the journal of each house. The statute rolls themselves may be contradicted by the journal entries and the law itself overthrown, if these entries show, clearly and beyond a doubt, a want of conformity to the mandates of the Constitution. State v. Ray, 109 Mo. 597; State ex rel. v. Mead, 71 Mo. 266. (5) The presumption is always strong that the Legis-

lature has not violated the Constitution in the passage of an act, duly authenticated by the signature of the presiding officer of both houses, approved by the Governor, and certified by the Secretary of State. State v. Ray, 109 Mo. 598; Railroad v. Governor, 23 Mo. 353; State v. Peterson, 38 Minn. 143; Miller v. State, 3 Ohio St. 475; Williams v. State, 6 Lea (Tenn.) 549; Supervisors v. People, 25 Ill. 183; Larrison v. Railroad, 77 Ill. 11; Worthen v. Badgett, 32 Ark. 496; State v. Francis, 26 Kan. 731; Railroad v. Simmons, 75 Kan. 130. (6) Every enactment of the Legislature is presumed to be valid until the contrary is shown beyond a reasonable doubt. State v. Cantwell, 179 Mo. 280; Ex parte Loving, 178 Mo. 203; Atkins v. Kansas, 191 U. S. 207; Railroad v. Simmons, 75 Kan. 130. (7) Where the entries in the journal of the Legislature are conflicting, so that it is impossible to ascertain therefrom whether the bill was duly enacted, it will be conclusively assumed that the proper constitutional action was taken on same. Railroad v. Simmons, 75 Kan. 130; Homrighausen v. Knoche, 58 Kan. 646; State v. Francis, 26 Kan. 724; In re Vandenberg, 28 Kan. 243; State v. Frank, 60 Neb. 327.

LAMM, C. J.—*Mandamus*. Original proceeding. The Forty-seventh General Assembly (Laws 1913, p. 327) ostensibly passed an act relating to elections repealing sections 5891, 5893 and 5900, Revised Statutes 1909, and enacting new sections in lieu thereof prescribing the form of the ballot to be what is popularly known as a ''blanket ballot'' as over against a ''single ballot,'' as provided by the former statutes, and making other provisions not material here.

The sole question is whether that statute was passed in accordance with the safeguards and mandatory provisions of the Constitution. If yea, the writ does not lie. If nay, the writ should go requiring ballots to be printed in ribbon or single form.

. The constitutional provision, said by relator to be violated, reads, as set forth in Revised Statutes 1909 (Const., sec. 31, art. 4):

"No bill shall become a law unless on its final passage the vote be taken by yeas and nays, the names of the members voting for and against the same be entered on the journal, and a majority of the members elected to each house be recorded thereon as voting in its favor."

(*Nota bene*: As printed in Revised Statutes 1909, the words, "the vote be taken by *years* and nays," are used. The use of the word *years* instead of "yeas" is the product of slovenly proof-reading. A reference to the Constitution as printed in former revisions shows this to be so.)

A constitutional majority of the house was seventy-two. Bearing that in mind and conceding, as respondents formally do, that the petition is sufficient in form, the remaining facts are agreed to and are summarized as follows in respondents' statement of the case:

"That this act, known as House Bill No. 476, was introduced into the House by Mr. Orr on the 27th day of January, 1913 (House Journal, page 353); on February 3d the same was read a second time and referred to committee on elections (House Journal, page 547); on February 14th it was taken up for engrossment and placed on informal calendar (House Journal, p. 559); on February 26, 1913, it was twice amended in the House (House Journal, pages 1280, 1281); on March 5th it was reported duly engrossed (House Journal, pages 1662-1665); on March 12th it was placed on the informal calendar (House Journal, page —); on March 15, 1913, the bill was called up by Mr. Orr and the same was taken up for third reading and placed on final passage. The *aye* and *nay* vote was recorded, and the same was 71 *ayes*, 51 *nays, absent* 19, *absent with leave* 2. This would make a total of

143 members, which is one more than the total membership of the House of Representatives. This is accounted for by the fact that Mr. Overall was recorded as voting both for and against the bill. There being 142 members in the House, 72 votes were necessary to constitute a majority. *If Mr. Overall's name was disregarded, the Journal shows the bill received but 70 votes. If his name is regarded as having been erroneously tabulated as against the bill, the Journal shows it had but 71 votes* (House Journal, pages 2365-2366).

· "After the aye-and-nay vote had been taken, Mr. Orr moved that the vote by which the bill was passed be reconsidered, and that motion lie on the table. This motion.carried. (House Journal, 2366.) The bill went to the Senate and was reported back to the House on March 20th by the Secretary of the Senate as having been passed by that body. On March 21, 1913, the bill was read at length, and was signed by the Speaker in open session in the House of Representatives. (House Journal, page 3213.) It received the approval of the Governor April 7, 1913.

"It is apparent that the House clerk made a clerical error in recording the aye and nay vote on the bill. His totals show aye 72, nay 51, absent 17, absent with leave 2. The record of the roll call shows aye 71, nay 51, absent 19, absent with leave 2."

A majority of us have come to the conclusion the statute is invalid because of a palpable and transparent vice, a vice safeguarded against in the Constitution, and must fall. With it falls the repealing provision, thus leaving the former statutes (ostensibly repealed) as existing and live law.

The imminence of the general election has created an emergency requiring this case, instituted on the 16th day of October, 1914, wherein an alternative writ went on the 19th, appearance entered on the 20th,

and heard *ore tenus* yesterday, shall be decided today. Mindful of Chaucer's couplet:

"There nis no workman whosoever he be,
     That may both worke wel and hastily"—
it would have been better to have handed down a *per curiam* and let the opinion follow in due and orderly fashion, but that course was deemed unwise in this instance.

We are cited to cases from Kansas and Nebraska which, if allowed to control, might lead to a conclusion different from that arrived at and announced by us, supra, but an investigation of the Nebraska Constitution (Secs. 8 and 10, art. 3) shows that those sections construed by the Nebraska court differ in essential features from the provision in our Constitution we are called on to construe and apply. In the principal Nebraska case, as we read it (State v. Frank, 60 Neb. 327), the *data* before the court showed that part of the essential record had been attached by a pin, and this pin had been removed and the record gone. The case, then, resolved itself into one of a pin lost, a paper lost, hence all was lost—the law going with the pin. In such fix the court upheld the law by a process of *reductio ad absurdum* reasoning, saying: "If counsel are right in their contention, then our important statutes are liable to be annulled by the accidental displacement of a pin."

The Constitution of Kansas construed by that court in a formidable line of decisions, much relied on by our learned Attorney-General, also differs materially from our own. [Secs. 128 and 131, art. 2, Const. Kan.] Hence the reasoning of that learned court, persuasive so far as applicable, but construing variant constitutional provisions, ought not to control our decision. Like cases make like law, but unlike cases have no such attending benediction.

Certain kindred provisions of our Constitution relating to the passage, verification, etc., of bills are

held directory, but the provision in hand has been held mandatory by this court. [State ex rel. v. Mead, 71 Mo. 1. c. 270.] That case adopted a new rule, a new prohibition, and observe (for we stress the fact), to that extent it exploded the common law doctrine relating to the integrity of legislative acts in the passage of bills, and it exploded the doctrine of this court announced in construing our Constitutions existing prior to 1865. The Constitution was written by plain men for a plain and obvious purpose, and is to be construed without refined subtlety, *i. e.*, delicacy of mental action. The provision in hand is cast in language unmistakable, mandatory and of an import not to be misunderstood. It stands on its own reason: *Stat pro ratione voluntas.* But many substantial and controlling reasons might be given did time permit or the occasion demand. Look at it. It starts off with the peremptory phrase, *"No bill shall become a law unless"*—unless what? Unless on its final passage "the vote be taken by yeas and nays." If that were all of it then the fore or aft recital of the journal that the vote was taken by yeas and nays and announcing a result might be sufficient. But the constitution-maker, writing paramount law controlling the legislative law-maker, the courts and the Governor, went further; witness, unless "the names of the members voting for and against the same be entered on the journal," and it did not stop there but goes on to say "and [unless] a majority of the members elected to each house be *recorded thereon* as voting in its favor." All these elements are essential prerequisites to the validity of a law, and one is just as essential as another. The *recording* of the votes is essential. The entering of the names of the voting members on the journal and showing a majority is essential, and the taking of the vote by yeas and nays is essential. Now, by the solemn admissions of our Attorney-General hereinbefore reproduced, that

part of the journal of the House devoted to the constitutional purpose in hand shows the bill did not receive a constitutional majority. No criticism can weaken, no analysis shake and no reasoning can overthrow that monumental fact. There it stands emblazoned on the record so that even he who runs may read. Hence, however much we might agree with counsel that every presumption is allowed in favor of the validity of a law and that courts, to sustain an act of the Legislature, will indulge such presumptions and not declare the law invalid nor make it perish except it be bad beyond a reasonable doubt, cannot apply here. We have written the law too often to the effect that presumptions take flight in the presence of the actual facts not to stand by the doctrine now.

The declarations of the journal that the bill was passed by a constitutional majority (for instance, the casting up of the vote at that figure) and the subsequent and prior entries shown by the journal containing narrations to a like effect are invoked to either dispute the *recorded vote* or to weaken the effect of the vote and introduce doubt and uncertainty whereby, when thus created, it is ingeniously argued the evidence of the journal prepared for a high constitutional purpose may be whittled away or impugned, leaving the law stand because of such doubt. But in a plain case like this such reasoning we deem fallacious. If it be once allowed as sound then the constitutional provision will not be worth the paper it is written on. It will become a mere empty noise, signifying nothing. This is so because it will be found that those journals generally assert their own validity and doubtless no law was ever passed in violation of this provision of the Constitution in regard to which the journal did not contain self-serving narrations announcing or squinting at the validity of the law. As said for this court by SHERWOOD, J., in the Mead case, supra: ''It would be but an easy matter by a simu-

lated observance of constitutional forms in the registry of falsehoods upon the journals, to evade and defeat the most rigid provisons of the organic law that the wit of man is capable to devise.''

Take a kindred case to illustrate: A judgment of a court of record solemnly entered and rich and full in recitals of service was entered in Jones v. Smith. Subsequently it turns out that no service was had on Smith and the fact of no service is made to appear from that part of the record intended to preserve the fact of service, say, the sheriff's return, or, where substituted service has been resorted to, the order of publication and proof thereof. Our reports are full of cases adjudicating that precise question in which we have held that the solemn recitals of the judgment record must fall to the ground on proof of the actual facts. The facts in the case at bar and the facts just hypothesized in the case of Jones v. Smith are alike in quality.

I am no stickler for over-refinement in strictness of construction of the Constitution. Let it be reasonably construed and without sticking in the bark—but let it be *enforced* when there are no two ways about its meaning. If the people want another let them get another, but let them get it in a constitutional way and not in an unconstitutional way, to-wit, by judicial action.

Let the final writ go requiring the printing of ballots as prayed for in accordance with sections 5891, 5893 and 5900, Revised Statutes 1909. All concur except *Graves* and *Woodson, JJ.,* who dissent in a separate opinion by *Graves, J*

GRAVES, J.—We do not concur with the views expressed by the majority in the opinion and judgment in this case.

State ex rel. v. Drabelle.

The act in question, the validity of which is challenged by this proceeding, was House Bill No. 476, at the legislative session of 1913. When this bill came up for third reading and passage, and after the vote was taken upon the bill, the record before us from the House Journal shows: "Title to House Bill No. 476 was read and agreed to. Mr. Orr moved that the vote by which House Bill No. 476 was passed be reconsidered, and that motion lie on the table—motion carried." This was on March 13, 1913. On March 20th was this entry: "All other business was suspended, House Bills Nos. 23, 623, 282, 760, 280, 476, 494, 410, 746, 466 and 215 were read at length, and there being no objections, the Speaker, in open session, in the presence of the House, affixed his signature thereto as provided by the Constitution."

The bill had already passed the Senate.

In the record before us we find a full history of this bill from its introduction by Mr. Orr, its author, to the signing thereof by the Governor. The memoranda on the back of the bill read:

House Bill No. 476.
An Act
    To repeal sections 5891, 5893 and 5900 of article 5, chapter 43 of the Revised Statutes of Missouri, 1909, entitled "Elections" and to enact new sections in lieu thereof.
    Read first time Jan. 27, 1913, and 500 copies ordered p i ted.
                    OMAR D. GRAY, Chief Clerk.

    Read second time Feb. 3, 1913, and referred to the committee on Elections.
                    OMAR D. GRAY, Chief Clerk.

    Reported from the Committee on Elections Feb. 6, 1913, with recommendation that the bill do pass.
                    OMAR D. GRAY, Chief Clerk.

    Ordered placed upon the informal calendar, Feb. 14, 1913.
                    OMAR D. GRAY, Chief Clerk.

    Taken up Feb. 26, 1913, House amendments Nos. 1, 2 and 3 offered and adopted. Bill as amended ordered engrossed and printed.
                    OMAR D. GRAY, Chief Clerk.

State ex rel. v. Drabelle.

Reported from the Committee on Engrossed Bills, Mar. 5, 1913, as truly engrossed and correctly printed.

OMAR D. GRAY, Chief Clerk.

Taken up Mar. 12, 1913, and ordered laid on the informal calendar.

OMAR D. GRAY, Chief Clerk.

Taken up Mar. 13, 1913, and read third time, duly passed, title agreed to, motion to reconsider vote by which bill passed tabled.

OMAR D. GRAY, Chief Clerk.

Reported from the House 3-13-13.

R. L. DANIELS, Sec't.

Read first time in Senate 3-14-13.

R. L. DANIELS, Sec't.

Read second time 3-15-13 and referred to Committee on Elections.

R. L. DANIELS, Sec't.

Reported from the Com. on Elections 3-20-13, with the recommendation that the bill do pass.

R. L. DANIELS, Sec't.

Taken up 3-20-13, read third time and placed upon its passage, passed, title agreed to, motion to reconsider vote by which bill passed tabled.

R. L. DANIELS, Sec't.

Reported from the Senate Mar. 20, 1913, as having been duly passed.

OMAR D. GRAY, Chief Clerk.

Reported from the Committee on Enrolled Bills, Mar. 21, 1913, as truly enrolled. All other business being suspended, bill read at length, officially signed by the Speaker, Mar. 21, 1913. Delivered to the Governor.

OMAR D. GRAY, Chief Clerk.

On April 7, 1913, the Governor signed the bill and returned it to the Secretary of State, and later it appeared in the Laws of 1913, at pages 327 and 328.

As conclusive evidence of the invalidity of this bill the relator urges the following portions of the House Journal:

Thursday, Mar. 13, 1913.

Mr. Orr called up House Bill No. 476 from the informal calendar and moved that the bill be taken up for third reading and placed on its final passage.

State ex rel. v. Drabelle.

Motion carried.

House Bill No. 476 entitled

An Act to repeal sections 5891, 5893 and 5900 of article 5, of chapter 43 of the Revised Statutes of Missouri, 1909, entitled 'Elections,' and to enact new sections in lieu thereof.

Was read third time and passed by the following vote:

AYES—Messrs.

| | | | |
|---|---|---|---|
| Adams | Fugate | McRoberts | Shepperson |
| Armstrong | Gross | Miller | Somerville |
| Asbury | Haenssler | Moore (Barton) | Stark |
| Baskerville | Haskins | Moore (Perry) | Stephens |
| Bowman | Hay | Morgan | Taylor (Wright) |
| Boyd | Hays | Oliver | Teel |
| Bradley | Houx | Orr | Tegethoff |
| Bretz | Hunt | Overall | Thice |
| Brown | Huston | Peery | Towe |
| Calkin | Inglish | Poston | Towson |
| Clark | Jackson; | Proctor | Watson |
| Colley | Johnson | Remmers | Wilder |
| Cox | Kayffman | Roney | Wiley |
| Curran | Kennedy | Salts | Willeford |
| Dumm | Lyles | Schofield | Wolfe (Jasper) |
| Eaton | McCarty | Scott | Wright (Carroll) |
| Erman | McCullum | Shannon | Mr. Speaker-72 |
| Fluty | McKnight | Sharrock | |

NOES—Messrs.

| | | | |
|---|---|---|---|
| Barbee | Fields | Moroney | Turley |
| Bowers | Fulbright | O'Brien | Tyler |
| Brooks | Harris | Overall. | Valentine |
| Brownlee | Hodges J. | Phelps | Vitt |
| Brydon | Jones | Richter | Vosholl |
| Burch | Kyle | Ryan | Walton |
| Carrington | Langenberg | Schultz | Watts |
| Cooper | Leazonby | Sheehan | Whitaker |
| Cornelius | Lloyd | Snodgrass | Wolff (Jefferson) |
| Correll | Lutes | Swiers | Woods |
| Darby | McNamara | Swope | Woodward |
| Dawson | Melvin | Taylor (Texas) | Wright |
| | | | (Greene)  51 |
| Dugan | Mills | Tuggle | |

ABSENT—Messrs.

| | | | |
|---|---|---|---|
| Blunk | Farrington | Martin | Ratchford |
| Boone | Hicks | Murphy | Sullivan |
| Chaney | Hodgdon | Peters | Swearingen |
| Claiborne | McGrath | Peterson | Taylor |
| | | | (Jackson) |
| Coulter | McMillen | Praiswater | —17 |

ABSENT WITH LEAVE—Messrs.

| | | |
|---|---|---|
| Morehead | Reyburn | Total absent with leave—2. |

This sufficiently outlines the facts. It should be added that the law sought to be abrogated is one which provides for what is called in common parlance a blanket ballot. In other words, a large sheet of paper upon which is printed the ticket of each of the political parties, so that all tickets to be voted appear upon one sheet of paper, instead of having the ticket of each political organization upon independent slips of paper. The manner in which this blanket ballot shall be used by the voter is prescribed by section 5900, Laws 1913, at page 328, as follows:

"Section 5900. *Voting—voter shall proceed, how.* On receipt of his ballot the elector shall forthwith, and without leaving the polling place, retire alone to one of the places, booths or compartments provided to prepare his ballot. He shall prepare his ballot by marking out all the groups other than the one he wishes to vote. After selecting the group he wishes to vote he shall erase or strike out therefrom the name of any candidate he does not wish to vote for and write in the space provided the name of his choice underneath. After preparing his ballot, the elector shall fold the same so that the face of the ballot will be concealed, and the signature or initials of the judges of election may be seen. He shall then hand the ballot to the judge of election selected to take ballots, who shall number the ballot and deposit it in the ballot box: *Provided* that any outside party shall have the right to challenge any voter whom he suspects to be an illegal voter, and the judge[s] shall determine the right of the party challenged to vote."

This we set out to show the simplicity of the method. The legal questions we formulate and discuss below.

I. Respondent urges that the House Journal entries fail to show that the bill passed by the

State ex rel. v. Drabelle.

constitutional vote of 72. The House

**Impeaching Properly Attested Bill: Province of Legislative Body and Not of Court.** was made up of 142 members and it took 72 to be a majority. He further contends that under section 31 of article 4 of the Constitution, this bill did not become a law, because the House Journal did not show that it received 72 votes, as such votes are spread upon the record. This constitutional provision reads:

"No bill shall become a law unless on its final passage the vote be taken by yeas and nays, the names of the members voting for and against the same be entered on the journal, and a majority of the members elected to each house be recorded thereon as voting in its favor."

Respondent does not refer to sections 37 and 38 of article 4 of the Constitution, which read:

"Sec. 37. No bill shall become a law until the same shall have been signed by the presiding officer of each of the two houses in open session; and before such officer shall affix his signature to any bill, he shall suspend all other business, declare that such bill will now be read, and that, *if no objections be made, he will sign the same to the end that it may become a law*. The bill shall then be read at length, *and if no objection be made* he shall, in the presence of the House, in open session, and before any other business is entertained, affix his signature, which fact shall be noted on the journal, and the bill immediately sent to the other house. When it reaches the other house, the presiding officer thereof shall immediately suspend all other business, announce the reception of the bill, and the same proceedings shall thereupon be observed in every respect, as in the house in which it was first signed. If in either house any member shall object that any substitution, omission or insertion has occurred so that the bill proposed to be signed is not

261Mo34

the same in substance and form as when considered and passed by the house, *or that any particular clause of this article of the Constitution has been violated in its passage, such objection shall be passed upon by the house,* and if sustained, the presiding officer shall withhold his signature; but if such objection shall not be sustained, then any five members may embody the same over their signatures, in a written protest, under oath, against the signing of the bill. Said protest, when offered in the house, shall be noted upon the journal, and the original shall be annexed to the bill to be considered by the Governor in connection therewith.

"Sec. 38. When the bill has been signed, as provided for in the preceding section, it shall be the duty of the Secretary of the Senate, if the bill originated in the Senate, and of the Chief Clerk of the House of Representatives, if the bill originated in the House, to present the same in person, on the same day on which it was signed as aforesaid, to the Governor, and enter the fact upon the journal. Every bill presented to the Governor, and returned within ten days to the house in which the same originated, with the approval of the Governor, *shall become a law,* unless it be in violation of some provision of this Constitution."

The italics are ours.

In passing upon the validity of a law, the passage of which is questioned, all the constitutional provisions must be considered, and this we purpose to do.

The purpose of section 31, supra, was to have of record the names of those voting for and against the bill. The purpose of section 37 was to silence all objections to the legal passage of the bill. If any clause of the Constitution had not been fully met in the passage of the bill, objections must be made before the signature of the presiding officer is attached thereto, thus certifying the legal passage of the bill. No objection was entered here and the certification

of the legal passage of this bill was permitted to go.
This opportunity for objection to the alleged pas-
sage of a bill has some meaning. The makers of
the Constitution knew, as do we know, that mem-
bers of legislative bodies keep close tab upon the
vote in a closely contested fight. This bill was
such a fight. This clause of the Constitution gave a
right to object to the signing of the bill if any partic-
ular clause of the Constitution had not been observed
in its passage. The term ''any particular clause'' as
used in section 37, supra, covered section 31, supra.
If no such objection is offered it is strong evidence
of the fact that no such objection existed as a matter
of fact.

But this is not all of the meat to be found in
section 37 of article 4 of the Constitution, supra. In
all the cases in this State discussing section 31, supra,
and holding that this court can go to the journals and
declare from them the fact whether or not a bill has
legally and constitutionally passed the House or the
Senate, no reference has been made to the provisions
of section 37, supra. Its force and effect have never
been discussed in this connection.

Now, note this language in said section 37: ''Such
objection shall be passed upon by the House.''. Does
this mean that the constitutional and legal passage
of a bill shall be adjudged by a court, or does it mean
that the fact as to whether or not the bill has been
constitutionally and legally passed shall be adjudi-
cated by the legislative body—which passes it? In
my judgment it means the latter, and that when such
legislative body adjudges its legal passage, as was
done in the case of the bill at bar, this court cannot
go behind such adjudication of the legislative body.

At common law the courts could not go to jour-
nals of a House to impeach a duly certified bill or
law. Upon this question in Oklahoma, a State wherein
we find a constitutional provision about recording

the "yeas and nays" upon the final passage of a bill, just as we have in this State, the court in Railroad v. State, 113 Pac. l. c. 923, said:

"At common law the rule prevailed that the enrolled bill is conclusive and may not be impeached by resort to the legislative journals. [Rex v. Arundel, 80 Eng. Rep. (full reprint) 258; Edinburgh Ry. Co. v. Wauchope, 8 Cl. & F. 710; Lon. and Can. L. & A. Co. v. R. M. of Morris, 7 Manitoba, 128.]"

The court then after a review of a great list of cases upon both sides of the question, holds that it is precluded from going behind the certified bill.

Pages 922 and 923 of this opinion by Judge HAYES furnishes instructive reading, and reasoning well worthy of consideration.

In the second edition of Sutherland on Statutory Construction, vol. 1, pages 72 and 73, it is said:

"It is no longer true that 'in a large majority of the States' the courts have held that the enrolled act may be impeached by a resort to the journals. A comparison will show that the courts are now about equally divided on the question. The *current of judicial decision in the last ten years has been strongly against the right of the courts to go back of the enrolled act.* Undoubtedly the decision of the Supreme Court of the United States in Field v. Clark, 143 U. S. 649, has had much to do in creating and augmenting this current, but it may also be due to the greater simplicity, certainty and reasonableness of the doctrine, which holds the enrolled act to be conclusive. Many courts and judges, while feeling compelled to follow former decisions holding that the enrolled act may be impeached by the journals, have done so reluctantly and have expressed doubts as to the validity of the doctrine, and in many cases, as will appear in the following sections, have qualified and restricted it in important particulars."

The learned author then at section 46, page 74, of the same volume, thus proceeds to give the reasons for the courts' departing from the doctrine of going to the journals:

"There is necessarily a substantial similarity in the manner in which the original material for legislative journals is made up. As business progresses in the legislative body, the secretary or clerk takes down memoranda of what is transacted. His work is facilitated by the use of printed or stensil forms, printed lists of members, for use on roll call, and the like. These memoranda, partly printed and partly written, together with messages, original bills, reports of committees and other documents, all on loose sheets of paper, are the original material for the journal. The memoranda are necessarily hastily made and often in the midst of much confusion and excitement. Sometimes these original memoranda and documents are loosely fastened together, and constitute the journal to which the courts resort in order to determine whether an enrolled bill has been duly passed. Sometimes these memoranda are copied into a book which becomes the authoritative journal by which the existence of legislative acts is tried. In all cases the journals are printed, sometimes from the original memoranda and sometimes from a copy especially made for that purpose. Sometimes there are thus preserved three journals, as it were; the original memoranda and documents, the written and printed journals, and sometimes these all differ each from the others. Sometimes the journals are read and approved, and sometimes their reading is dispensed with, even for the whole session. The unsatisfactory nature of this evidence is frequently pointed out not only by the courts which refuse to resort to it, but also by the courts which do."

The Constitution of the United States, section 5, article 1, provides for the "yeas and nays" upon any

question, and these to be kept in a journal of the house. Yet with this provision, the Supreme Court through the lamented Mr. Justice HARLAN, in Field v. Clark, 143 U. S. 672, said:

"The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two Houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. As the President has no authority to approve a bill not passed by Congress, an enrolled act in the custody of the Secretary of State, and having the official attestations of the Speaker of the House of Representatives, of the President of the Senate, and of the President of the United States, carries, on its face, a solemn assurance by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress. *The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress,* all bills authenticated in the manner stated; leaving the courts to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the Constitution."

Again the italics are ours. The very limited time at our command precludes us from going further into the great mass of cases holding as does Mr. Jus-

tice HARLAN, but the long list thereof will be found collected and commented upon with painstaking care by HAYES, J., in Railway v. State, 113 Pac. 1. c. 922 et seq.

That the modern rule is contrary to the rule first announced in this State in State ex rel. v. Mead, 71 Mo. 266, is evident. It is also evident that the modern doctrine is in full accord with the views first expressed by this court, through SCOTT, J., in Railroad v. The Governor, 23 Mo. 353.

In the majority of the earlier cases and text-books the rule was announced as we announced it in the Mead case, supra, but the courts have drifted away from these views, until the later and better text-writers were forced to recognize the changed views of the courts. [*Vide* Sutherland, supra.]

But we are not driven to this proposition in the case at bar. Nor are we driven to comment upon the very unreliable source from which our legislative journals are made up and formulated in this State, as elsewhere, but we can, in full reliance, fall back upon section 37 of article 4 of our Constitution, which makes the legislative body the trier of the question now in dispute, and not this or any other court the trier of such question. In none of our cases have we discussed the question in the light of this constitutional provision. When this bill No. 476 was called up before the House under the mandate of section 37, supra, the objection could have been made that the journal of the House showed that it had not received a constitutional vote as required by section 31, and such objection would then have become an issue to be tried and determined by the House. In the language of the Constitution "such objection shall be passed upon by the House."

We are therefore of the opinion that this court cannot go back to the journals for the purpose of invalidating this law, and that the law as certified to

by the legislative officials and the Governor is a valid and binding act.

II.   Passing now the general proposition, that under the weight of modern authority and under the particular wording of section 37 of article 4 of our Constitution, this court has no right to go to the House Journal to find evidence of the

**Doubt:**
**Manifested by**
**Journal that**
**Impeaches Itself.**

invalidity of this law, we will take the case upon another theory. Grant it (which we do not grant) that the court has the right to go to the House Journal to impeach the law, yet under the evidence before us, the Legislature does not stand convicted of wrongfully promulgating the law in question. Even in those States which hold that the integrity of the law may be impeached by the legislative journals, the further rule is announced that the proof furnished by such journals must be "of the clearest, strongest and most undoubted character." [In re Taylor, 60 Kan. l. c. 92.] To like effect is the statement of Mr. Justice VALENTINE in State ex rel. v. Francis, Treas'r, 26 Kan. l. c. 731, whereat he said: "The enrolled statute is very strong presumptive evidence of the regularity of the passage of the act and of its validity, and that it is conclusive evidence of such regularity and validity, unless the journals of the Legislature show, clearly, conclusively and beyond all doubt that the act was not passed regularly and legally. . . .  If there is any room to doubt as to what the journals of the Legislature show, if they are merely silent or ambiguous, or if it is possible to explain them upon the hypothesis that the enrolled statute is correct and valid, then it is the duty of the courts to hold that the enrolled statute is valid."

Under the rule in the States holding that the law may be impeached by the legislative journals, it must be said that they recognize the further doctrine that

if this sole witness impeaches itself the courts must permit the law to stand. This witness in this case impeaches itself. One part of this record, which we have set out in two parts in our statement, shows that the bill did pass, whilst the other portion shows or tends to show that it did not pass. But this is not all. That portion of the record which tends to show that it did not pass is contradictory. It shows that Representative Overall, both voted *for* and *against* the bill. How could a record more thoroughly impeach itself than is shown by this admitted fact. What more would a court want to say that there was doubt as to the reliability of such a record? If there is doubt as to the reliability of the record, then under all the rules the court must resolve the doubt in favor of legitimate action upon the part of the legislative body, and sustain the law.

In such a case the court not only has the right to say, but should say, that a record, which thus bears upon its face, a slovenly, careless and unreliable make-up, should not be permitted to overcome the solemn certificate of the legislative officials wherein it is said the bill was duly passed. From this record no court could say how Mr. Overall voted. If in the making up of this record from the memoranda made at the time the vote was taken the officer in the House having charge thereof was so careless as to make this mistake, what other mistakes may have been made? Some voting against the bill may have voted for it; some marked absent may not have been absent and may have voted for it. But these are speculations. The idea is that the face of this record condemns its own verity, and it should be discarded. It is clear that the proper officer counting the vote announced that the bill had received 72 or more votes, or it would not have been declared *passed*.

We announce but a general rule when we say that a record which shows upon its face a falsehood should

be discarded by the courts. This record so shows. Upon a roll call of the House Mr. Overall's name could be called but once, and the record clearly falsifies the fact when it records him as voting upon both sides of the question. I care not what other facts may truthfully appear from this record, this irregularity precludes a court from giving confidence to it. But going further it appears that the party who made up this record says that there were seventeen absentees without leave, whilst he makes it appear from a list of the names that there were nineteen of such absentees. It may be that two of the names in the absentee column were present and voted for the bill, but were erroneously put in the absentee column. It is clear that from some source he got the idea of there being only seventeen absentees without leave and two with leave.

These irregularities upon the face of the record impeach that portion thereof relied upon by relator to impeach this law. Thus far we have discussed the irregularities of that portion of the record relied upon by the relator. They are such as to kill its potency as a witness against the validity of the law. The broader question of the condition of the whole record we take next.

III. Going to the whole legislative record as found in the journals of the House, we find that such record declared that House Bill No. 476 was passed, Thursday, March 13, 1913. After its passage as thus declared by the record we find from the same record, on the same day the title was read and agreed to, that Mr. Orr "moved that the vote by which House Bill No. 476 *was passed* be reconsidered, and that the motion lie on the table." The record then says as to this motion: "Motion carried." Throughout the record was the word "passed" which in legal and legislative parlance can have but one meaning, i. e., that it received a constitutional vote. On the

other hand if we take the whole journal record, and strip that part of it relied upon by the relator of all its irregularities and incongruities, and make it say that only 71 votes were cast for House Bill No. 476, yet we have one part of the record contradicting the other, and we are still left in doubt. Again we say where there is doubt the validity of the law must be upheld.

In Kansas where they adhere to the rule that the validity of a law can be impeached by the journal with a fair face, yet under facts exactly parallel to the facts here, that court refused to invalidate a law. Our time is so limited for this opinion, i. e., from 9:30 a. m. to 5 p. m., that we will content ourselves by letting the Kansas court speak for us upon the question. In Railway Co. v. Simons, 75 Kan. 1. c. 131, JOHNSTON, C. J., thus states his case:

"It is claimed that the statute in question has no legal existence because the Legislature did not fully comply with the constitutional requirements in its passage. The particular defect pointed out is that, according to the House Journal, the act did not receive a constitutional majority of the members of the House of Representatives. The act was designated 'House Bill No. 979,' and the entry in the journal, after giving the number and title of the bill, is that it 'was read the third time, and the question being, shall the bill pass? the roll was called, with the following result: Yeas 83, nays 2; absent or not voting 40.' Then follows the entry, 'a constitutional majority having voted in favor of the passage of the bill, the bill passed, and the title, as above was agreed to.' Immediately following this is a list of 83 names purporting to be the affirmative vote on the bill; then follows a list of two names purporting to be the negative vote, and that is followed by a list of 40 names of members reported to have been absent or not voting."

The only difference between the facts in that case and the facts in this are: (1) that in the Kansas case the record as to the names of the parties voting for and against the bill, is *fair* and *regular* upon its face, whilst here it is not; and (2) that the Kansas record says "a constitutional majority having voted in favor of the passage of the bill, the bill is passed, and the title as above, was agreed to" whilst in the case at bar the record simply recites that the bill "passed."

As to the latter proposition there is no difference between the two cases, because in legislative as well as legal parlance a bill is only "passed" when it receives the constitutional vote. When our Speaker of the House declared this bill No. 476 "passed" he declared in effect that "having received a constitutional majority" the said bill "was duly passed." At page 132 of the Simons case Judge JOHNSTON further says:

"It is conceded that the act passed the Senate by an unquestionable majority, was duly approved by the Governor and properly deposited with the Secretary of State. The act upon its face as it is enrolled and printed is in all respects regular, and it is authenticated as the Constitution requires. It is signed by the presiding officer of each branch of the Legislature, the approving signature of the Governor is affixed and it has been duly published in the statute-book as the act itself provides. Although the act has been so certified by the officers having charge of legislation, and bears all the marks of authenticity, it is contended that the recitals in the journal of the House overcome this evidence and show that the act never received the requisite number of votes and therefore never became a law.

"The Constitution provides that the Legislature may 'increase . . . the number of judicial districts whenever two-thirds of the members of each House shall concur (Const., art. 3, sec. 14; Gen. Stat.

1901, sec. 161), and if we assume, as counsel on both sides do, that this means two-thirds of all members elected to each House, and that only eighty-three of the one hundred and twenty-five members of the House of Representatives voted in favor of the bill, it is plain that it did not receive the requisite number of votes.' We have, then, an enrolled bill duly certified and authenticated, an entry in the House Journal that it received a constitutional majority and had been passed, and another entry in the journal that only eighty-three members voted for the measure, which is less than a constitutional majority.

"Two theories obtain as to the method of determining whether what purports to be an act of the Legislature was constitutionally enacted. One, designated as the common-law rule, is that an enrolled bill authenticated and promulgated by the Legislature as having been duly enacted is conclusive evidence of the existence and contents of the act. The other is that when a question arises as to whether an act was constitutionally passed, courts may look beyond the enrolled bill and examine the journals of the Legislature in which are preserved the record of its proceedings to determine the existence and validity of the enrolled bill. There is a great diversity and some fluctuation of judicial opinion upon the question, but the rule that resort may be had to the legislative journals was early announced in Kansas and has been consistently followed from the first . . .

"In Kansas the enrolled bill is regarded as record evidence of the highest character, but not as conclusive evidence. The Constitution provides the manner in which a law shall be authenticated and when it bears these marks of authenticity it should not be lightly overthrown. The Constitution, which provides how a bill shall be passed, approved and authenticated, also provides that each House of the Legislature shall keep a journal of its proceedings while passing such bill,

and hence these journals are constitutional evidence of the principal steps taken by the Legislature during the progress of a bill from introduction to enrollment. The enrolled bills and journals together constitute the evidence of the acts passed by the Legislature and are the only evidence to which courts may look to ascertain whether the Legislature has observed the constitutional requirements in their enactments. The relative dignity and force of the two kinds of evidence have frequently been considered. The rule was tersely expressed by Mr. Justice VALENTINE in State ex rel. v. Francis, Treas'r, 26 Kan. 724, wherein he said what has hereinbefore been quoted at page 536.

"In Homrighausen v. Knoche, 58 Kan. 646, the validity of an act was challenged upon the ground that a constitutional majority of the House did not vote in favor of the measure. Some of the entries in the journal indicated that a constitutional majority had voted for the bill, while others indicated the contrary, and it was held that the journal did not make that clear and conclusive showing of invalidity which would overthrow the evidence furnished by the enrolled bill. In the case of In re Taylor, 60 Kan. 87, the following language was used: 'While the journals of the two houses may be examined for the purpose of ascertaining whether the legislative branch has expressed its will in accordance with constitutional requirements, yet a legislative measure which has taken upon itself all the forms and appearances of verity which are involved in its enrollment in the office of the Secretary of State, its certification by the President of the Senate and Speaker of the House and its approval by the Governor may not be impeached by the legislative journals except when the proof furnished by them is of the clearest, strongest and most undoubted character.'

"In State v. Andrews, 64 Kan. 474, the rule was stated in about the same form except that it was in-

tensified by an additional adverb: 'An enrolled stat-
ute imports absolute verity and is conclusive evidence
of the passage of the act and of its validity, unless
the journals of the Legislature show *affirmatively,*
clearly, conclusively and beyond all doubt that the act
was not passed regularly and legally.'—(Syllabus.)

    "The application of this rule sustains the validity
of the statute in question. The presumption of valid-
ity which goes with an enrolled bill can never be
overthrown by entries in a journal which are them-
selves inconsistent and contradictory. The journal
does not show 'affirmatively, clearly, conclusively and
beyond all doubt' that the bill failed to receive a con-
stitutional majority. It is true that the entry of the
yeas and nays on the roll call shows but eighty-three
affirmative votes, but there is a later entry in the
same journal that a constitutional majority did vote
for the measure and that the bill passed. The duty
devolved upon the Speaker with the assistance of the
Clerk to ascertain how many votes were cast for and
against the bill, and to decide whether a constitutional
majority had voted for its passage. The votes were
counted and a decision was made by the presiding
officer that a sufficient number of the members had
voted for the bill to pass it, and this decision was
entered upon the journal. As the Constitution re-
quires each house to keep a journal of its proceedings,
a determination and declaration by the House that a
constitutional majority of the votes had been cast for
the bill was an important proceeding of that body and
one properly recorded in its journal.

    "It is suggested that the record of the yea and
nay vote is a more detailed statement of the proceed-
ings and necessarily better evidence of the legislative
action than the statement of the court and decision
made by the presiding officer. Each is required to be
entered upon the journal, and there is nothing in the
language of the Constitution indicating that one is

paramount to the other. If it be granted that, in its nature, the entry of the yea-and-nay vote is more convincing than the entry of the decision that the requisite votes had been cast, the repugnancy and contradiction in the journal remain. The fact that the journal contains entries directly opposed to each other— entries which cannot be reconciled, so that to accept one would be to disregard the other—gives rise to a doubt of the accuracy of the journal itself and makes it clear that under the rule such evidence cannot be used to impeach and overthrow a duly authenticated statute.

"The rule was applied to a somewhat similar state of facts in the case of In re Vanderberg, 28 Kan. 243, where it was claimed that an act creating a judicial district did not receive a constitutional majority of the House of Representatives. Some entries in the journal indicated that a majority voted for the bill, while other entries were to the effect that the legal vote cast for the bill lacked one of making the needed majority. After pointing out the repugnant statements in the journal, and showing that upon its face it was conflicting and ambiguous, the court remarked that 'the enrolled statute is not to be set aside upon mere guesses or surmises nor upon a doubtful interpretation of a journal seemingly contradictory upon its face.'—[Page 257.]

"In explanation of defects and inconsistencies found in the journals of the Legislature it has been said they are 'hurriedly and sometimes carelessly made. The reading of the same for correction and approval from day to day is frequently dispensed with and therefore it is not difficult to account for ambiguities and inaccuracies that may be found therein.' [Homrighausen v. Knoche, 58 Kan. 646, 649.] Under the methods used in taking and recording the votes of the members mistakes may readily be made. As all familiar with legislative proceedings

know, the clerk uses a printed roll of the members' names, with a column for the yeas on one side and a column for the nays on the other, and as the members answer to the roll call a check-mark or figure is placed in the yea or nay column opposite the names. Sometimes there is a second call of those absent or not voting on the first call, and if, they respond other marks are made to designate their presence and the votes cast. Occasionally members change their votes on a measure and this requires a change of the marks already made on the roll; and all must be made amid the hurry and distraction of a busy Legislature. The journal is made up at a later time from this and like memoranda, and it is easy to see how errors might creep into a record made in this way. In speaking of the manner in which the proceedings of the Legislature are recorded, and the weight to be given journal evidence, this court has said: 'It is no reflection upon legislative integrity, no criticism of legislative methods, to say that the journals of the houses are often carelessly, inaccurately and partially kept. They are often hurriedly made up, written by clerks having little aptitude for the work and slight sense of responsibility in its performance. Upon many days, especially as the session advances, the business accumulates, the saving of time becomes important, and the reading of the journal of the preceding day is dispensed with, so that mistakes fail of correction and unfortunately pass into forms of legislative history. It is also a notorious fact that in many cases, to a great extent in all cases, the journals are not made up until after the legislative session is closed. They are then put into such methodical shape as can be done, made up of the loose and disconnected memoranda noted from day to day as the legislative session progresses. These facts justify courts in attaching less weight to journals of legislative proceedings as evi-

dence of the non-enactment of laws than they would otherwise possess.' [In re Taylor, 60 Kan. 87, 93.]

"It appears that on the morning following the passage of the bill in question, the House dispensed with the reading of the journal, and that may account in some measure for the failure of the House to notice or correct the inconsistency of the entries in the journal. However that may be, it is clear that these entries involve too much of inconsistency and doubt to impeach or overthrow a properly authenticated statute."

In Nebraska a similar question is likewise ruled. [State v. Frank, 60 Neb. 327.]

So that we hold that taking the whole legislative record as fully set out in our statement, it is so contradictory as to render its effect *nil* so far as the validity of the act in question is involved.

The law in question is a good law. It stops known political tricks practiced under the single-ticket ballot law. Under the old law a "Democratic ticket" or a "Republican ticket" could be purloined from the judges after the names of the judges had been written upon the back thereof. One desiring to buy votes with certainty could take this purloined ticket and say to the voter whose vote is being purchased, "You vote this ticket that I give you, and bring me back a clean 'Democratic ticket' or a clean 'Republican ticket,' and then you will get your money." The voter could be watched from a distance to see whether or not he juggled with the stolen ticket given to him. In this way there was an endless chain of fraud. The larger ballot provided for by this law is not so easily handled. We believe the law a wise and good one, and that the assault upon its validity has failed. The writ should be denied. *Woodson, J.,* concurs in these views.