# Ex parte JAMES SEWARD, Petitioner.

## In Banc, June 21, 1923.

1. **LAWS: Enacted at Extra Session: Submission of Subject: Equivalent to Recommendation.** The word "recommended" used in that part of the Constitution (Sec. 55, art. 4) declaring that "the General Assembly shall have no power, when convened in extra session by the Governor, to act upon subjects other than those . . . recommended by special message to its consideration" does not mean that the Governor must request or advise the passage of an act on a named subject; the word "recommend" in that connection means "to submit," "to give in charge to." The important word is "subjects," and the important fact is that until the Governor submits a certain subject-matter for consideration the General Assembly has "no power to act." So that a special message from the Governor to the Legislature assembled in extra session stating that "you are hereby authorized to take up for consideration the repeal of the statute abolishing capital punishment, and the reenactment of such a statute in lieu thereof as you may determine" was a recommendation in the constitutional sense of the word "recommended."

2. ————: **Amendments: Printed Before Adoption.** Notwithstanding the constitutional provision that "if a bill passed by either house be returned thereto, amended by the other, the house to which the same is returned shall cause the amendments so received to be printed . . . for the use of the members before final action on such amendments," it will not be held, in the absence of affirmative showing by the journal of the house, to which amendments added to a bill by the other were returned, were not printed before final action thereon. In the absence of a constitutional requirement that the fact that the amendments have been printed be reported to the house and spread upon its journal, silence of the journal on the question of their having been printed cannot be held to establish the fact that they were not printed; nor, in the absence of such requirement, will such silence authorize a resort to oral evidence to prove that they were not printed. The presumption is that the house obeyed the constitutional command, and that presumption cannot be overthrown by parol evidence, or the absence from the journal of any recital on the subject.

299 Mo.—25.

3. ———: **Identification of Bill at Each Reading.** It is not necessary that the journal entries set out the full title of a bill every time it is read; if the entries contain ample recitals to identify the bill as the one to which the journal entries refer, that is sufficient.

4. ———: **Reading Bill on Sunday.** Notwithstanding the constitutional requirement that all bills shall be read on three separate days in each house, the reading of a bill on Sunday in one house is not equivalent to not reading it at all. The Constitution does not prohibit legislative action on Sunday, and whatever view may be taken of the propriety or morality of a legislative session on Sunday the courts have no power to declare invalid a step taken on that day in the enactment of a statute.

> *Held*, by GRAVES, J., dissenting, that by the language of the Constitution declaring that "every bill shall be read on three different days in each house" was meant three secular days, and it was not intended by the framers of the Constitution or by the people who adopted it that sessions of the General Assembly must or may be held on Sunday; that it is not a question of express prohibition of Sunday sessions, but an ascertainment of what was intended by the words used; that that intention is to be ascertained from the circumstances and conditions of the people at the time the Constitution was framed and adopted, the public policy of the State as it then existed, and the history of the commonwealth; and this public policy, from the beginning of the State, was to regard Sunday as a day of rest and not as an ordinary work day for lawmaking; such being the meaning of the language, Sunday is not a legislative day, and a bill read on only two secular days in one house and a third time on Sunday is not a law, but is void.

5. ———: ———: **Work of Necessity.** Even if it could be held that the reading of a bill on Sunday is work, and that the statute prohibiting work on Sunday "other than the household offices of daily necessity, or other works of necessity or charity" applies to legislative action, still the question remains whether the enactment of the particular statute was work of necessity, and the judgment of the General Assembly on that question, such as the adoption of a resolution that the act in question is necessary to check a wave of crime, ought to have weight.

> *Held*, by GRAVES, J., dissenting, that a mere delay of one day in passing such an act at an extra session cannot be invoked as necessity for legislative action on Sunday.

## Habeas Corpus.

PRELIMINARY RULE DISCHARGED.

*A. L. McCawley* for petitioner.

(1)   The General Assembly in extraordinary session can legislate only upon those subjects specially designated in the executive proclamation by which it is convened, or by special message recommended to its consideration by the Governor after it shall have been convened, and an act not so designated or recommended is void.   Constitution, Sec. 55, Art. IV; Wells v. Railroad, 110 Mo. 286; State v. Rawlings, 232 N. W. 546; State ex rel. v. Rice, 241 S. W. 945; State ex rel. v. Woolen, 128 Tenn. 485.   (2)   No bill can become a law unless same shall have been read on three different days in each house.   Constitution, Sec. 26, Art. IV; State ex rel. v. Taylor, 224 Mo. 393; State ex rel. v. Drabelle, 261 Mo. 15.   The reading of a bill on Sunday does not comply with Section 26, Article 4, of the Constitution.   (3)   The failure of the Senate to have House Amendments Nos. 1, 2 and 3, to Senate Bill No. 2, Extra Sessions, 1919—the capital punishment act—printed before the vote was taken on its final passage renders said act unconstitutional.   Constitution, Sec. 30, Art. IV; State ex rel. v. Drabelle, 261 Mo. 515; State ex rel. v. Field, 119 Mo. 593; Neiberger v. McCullough, 253 Ill. 221; Webb v. Carter, 129 Tenn. 191; Callahan Co. v. Smith & Smith, 304 Ill. 542. (4)   Courts may examine the record of legislative proceedings to determine whether, in the passage of a bill, the constitutional order of procedure was followed.  And if, upon an examination of the record, it appears that the several constitutional requirements in their proper order were ordered to be obeyed it will be presumed that they were obeyed as ordered and the act will be held to be valid.   But, if it shall appear from the record that a thing required by the Constitution to be done was done

in a manner contrary to that prescribed by the Constitution, or, if the records shall show that a thing required by the Constitution to be done was not done, or ordered by the General Assembly to be done, it will be fatal and the act must be declared void. State ex rel. v. Drabelle, 261 Mo. 515; State ex rel. v. Field, 118 Mo. 593; Neiberger v. McCullough, 253 Ill. 221; Webb v. Carter, 129 Tenn. 191; Callahan Co. v. Smith & Smith, 304 Ill. 542.

*Jesse W. Barrett,* Attorney-General, and *Merrill E. Otis,* Assistant Attorney-General, for respondent.

(1) Section 55 of Article IV does not require that the Governor shall in his message recommend the passage of a law. It requires merely that he shall recommend a subject to the consideration of the General Assembly. The mere fact that he sends the message shows that he recommends the consideration of the subject. If the words "recommend to your consideration," as here used, contain a shade of thought in addition to the idea contained in the words "submit to your consideration" or the words "authorize you to consider," that additional shade of thought can only be that the Governor is not only willing that the proposed legislation shall be enacted, but that in addition to being willing that it shall be enacted it is his personal desire that it shall be enacted. (2) The object of Section 55 of Article IV is to limit, for purposes of economy in government, the duration of an extraordinary session by restricting it to fixed and definite subjects. The essence of the provision and its sole intent is the limitation of the Legislature to such subjects. Obviously the object and intent are fully satisfied, whatever may be the formula employed by the Governor in his message, so long as the Legislature does confine itself to the particular subjects submitted. Wells v. Railroad, 110 Mo. 286; State v. Rawlings, 232 Mo. 544; Ex parte Fleming, 269 Mo. 366; State ex rel. v. Edwards, 241 S. W. 945. (3) Section 55 of Article IV has never been construed by the governors as requiring that they

should do more in a special message to an extraordinary session than to submit to the consideration of the General Assembly a particular subject-matter. Special message of Governor Stone, Senate Journal, Extra. Sess., 38th General Assembly, page 88; Special message of Governor Folk, Senate Journal, Extra. Sess., 44th General Assembly, page 24; Special message of Governor Folk, Senate Journal, Extra. Sess., 44th General Assembly, page 35; Special message of Governor Folk, Senate Journal, Extra. Sess., 44th General Assembly, page 46; Special message of Governor Folk, Senate Journal, Extra. Sess., 44th General Assembly, page 82; Special message of Governor Hyde, Senate Journal, Second Extra. Sess., 51st General Assembly, page 1576. (4) Even if it were permissible to go behind the language of this constitutional provision and to seek to ascertain the intent of the people by inquiring into their religious habits at the time they adopted the Constitution, no basis would be found therein for the contention that all governmental action on the part of any one of the co-ordinate departments is prohibited on Sunday. The most extreme views regarding the sanctity of the Sabbath never objected to the performance of necessary work on that day. (5) Sunday is a legislative day. It has been so held by the courts and has been so construed by the Legislature, which, from the beginning of the history of the State, has regularly paid its members for services on that day. State ex rel. v. Auditor, 37 Mo. 179. (6) At all events this particular provision of the Constitution is directory only. City of St. Louis v. Foster, 52 Mo. 513. See also State ex rel. v. Taylor, 224 Mo. 393. (7) Whether or not those sections of the Constitution which prescribe the procedure for the passage of a bill have been complied with is a legislative, not a judicial question. Having been determined by the Legislature (in the manner prescribed by Section 37 of Article IV) judicial inquiry is precluded. Pacific Railroad v. Governor, 23 Mo. 353, 362; State ex rel. v. Drabelle, 261 Mo. 515, 524 (dissent-

ing opinion of GRAVES, J., concurred in by WOODSON, J.);
State ex rel. v. Seibel, 262 Mo. 220, 228 (dissenting opin-
ion of GRAVES, J., concurred in by WOODSON, J.); 15 Co-
lumbia Law Review, 285; 12 Corpus Juris, 740; 6 Am.
& Eng. Ency. Law, 928. (8) The only exception to the
rule above stated is as to those sections of the Constitu-
tion governing legislative proceedings which provide ex-
pressly that a bill enacted in violation of them shall "not
become a law." All other sections are directory merely.
Section 30 of Article IV is not within the exception. State
ex rel. v. Drabelle, 201 Mo. 515; State ex rel. v. Mead, 71
Mo. 266. So Section 24 of Article IV is directory mere-
ly. Cape Girardeau v. Riley, 52 Mo. 428; St. Louis v.
Foster, 52 Mo. 513; Riesterer v. Land and Lumber Co.,
160 Mo. 141; Creason v. Yardley, 272 Mo. 279. And
Section 26 of Article IV. City of St. Louis v. Foster, 52
Mo. 513. And all of Section 37 of Article IV, except the
first clause. State ex rel. v. Mead, 71 Mo. 266; State
ex rel. v. Mason, 155 Mo. 486; Riesterer v. Land and Lum-
ber Co., 160 Mo. 141; State ex rel. v. Drabelle, 261 Mo.
515. And Section 38 of Article IV. State ex rel. v. Mead,
71 Mo. 266; State ex rel. v. Mason, 155 Mo. 486. (9)
Even as to those sections which have been held to be
mandatory, noncompliance with them, to be fatal, must
be affirmatively shown in the Journals. (And they must
be sections compliance with which is required to be noted
in the Journals.) State ex rel. v. Drabelle, 261 Mo. 515;
State ex rel. v. Field, 119 Mo. 593. (10) The present
attack upon the validity of the Capital Punishment Act
is not only not tenable under the original and general
rule as stated supra, but it does not fall within the excep-
tion to that rule recently recognized (in the Drabelle
Case) by the Supreme Court of Missouri. It cannot pre-
vail unless the court will now say that a solemnly enacted,
solemnly authenticated, solemnly enrolled and solemnly
promulgated law may be overthrown and held unconsti-
tutional, not by reason of anything appearing upon the
face of the law, nor by reason of anything appearing in

the official record of the Legislature, but merely upon a necessarily negative and inconclusive parole showing that some one of a great number of preliminary legislative steps may not have been taken in the regularly prescribed and constitutional manner.

JAMES T. BLAIR, J.—*Habeas Corpus.* The only questions raised concern the validity of the act of the Extra Session of the General Assembly of 1919 (Laws 1919, p. 778) whereby it was sought to restore capital punishment in this State. The act is assailed on the grounds: (1) that the subject was not brought before the General Assembly by either method authorized by the Constitution; (2) that the bill (Senate Bill No. 2) was not "read on three different days in each house" (Sec. 26, Art. IV); (3) that the House amendments to the bill were not "printed . . . for the use of the members before final action on such amendments" (Sec. 30, Art. IV); and (4) because of certain changes in the title during the passage of the act. Neither the proclamation calling the extra session, nor the message of the Governor sent in upon the convening of the General Assembly pursuant to that proclamation, brought the subject of capital punishment to the attention of that body. On the third of July, 1919, the Senate and House passed a concurrent resolution requesting the Governor for reasons stated, to "send to this General Assembly a special and supplemental message requesting and authorizing the enactment of such laws as will restore to the statute books of this State, the punishment by death . . .; all to the end that the safety and welfare of the citizens of this State may be properly guarded and protected." On the same day the Governor required to be assured that a quorum of the House favorable to the proposed bill would positively agree to remain to pass it in case he submitted the subject-matter for consideration. He wrote that if the assurances he required were given he would "be ready to take immediate action." The Gov-

ernor's request was complied with, and he thereupon sent his special message, as follows:

"To the Fiftieth General Assembly:

"Formally responding to your joint and concurrent. resolution of this date, requesting that I submit to you for your consideration the repeal of the law prohibiting capital punishment in this State and the restoration of capital punishment, I did not include this or any other subject in my call because, as stated to you in my message, I did not wish to obscure the main purpose for which you were assembled, namely, the ratification of the woman suffrage amendment. You have acted very promptly on that subject. It is now out of the way.

"By various votes taken by both of your bodies, it is clear that you do not desire to legislate at this time upon any subject other than the one mentioned above. It has also been represented to me that your action in this matter will be taken promptly. And, in view of the fact that the sentiment seems to be so overwhelmingly for a reconsideration of this subject, and in view of all of the circumstances, I have decided to accede to your request. Therefore, you are hereby authorized to take up for consideration the repeal of the statute abolishing capital punishment, and the re-enactment of such a statute in lieu thereof as you may determine.

"FREDERICK D. GARDNER, Governor."

On the same day Senate Bill No. 2 was introduced for the purpose of restoring capital punishment. It is contended that the bill was not read the three times on three separate days in the Senate and House. It is conceded that it was actually read three times, but it is urged that one of these three days was Sunday and is not to be counted for that reason. With respect to the printing of the House amendment to the bill, the parties stipulated as follows:

"That at the time of the passage of Senate Bill No. 2, at the extra session 1919 of the General Assembly of Missouri, the State's contract for all printing was with

the Hugh Stephens Printing Company of Jefferson City; that the records in the State Auditor's office do not show that the printing of the House amendments 1, 2 and 3 to said Senate Bill was ordered or paid for or charged to the State; that the records now in the possession of the Hugh Stephens Printing Company do not show that these amendments were printed, and that the clerk of said printing company, who has charge of their records and who received and made the tickets for legislative printing, has no record of the printing of said amendments, and has no independent recollection that the amendments were printed or ordered printed; that no books or records at the office of the said printing company show that any charge was made against the State for the printing of these amendments, and that no clerk at the office of the printing company has any present knowledge or recollection that these amendments were printed; that the records at the Auditor's office and at the office of said printing company do show charges and payments for other printing for said extra session; that Charles U. Becker, Secretary of State, is the legal custodian of the House and Senate journals and of the original and engrossed bills and amendments thereto and of the enrolled bills, and that there are no records in his custody showing the printing of the House amendments 1, 2 and 3 to said Senate Bill No. 2 or that said amendments were ordered printed and that he has no printed copies of said amendments.

"It is further stipulated and agreed by the parties hereto, through their attorneys, that the attached pages of the House and Senate journals, marked Exhibit 'A,' may be taken by the court as exact copies of the original entry of those items in the official House and Senate journals.

"It is further stipulated and agreed that the attached copy of the endorsements on the original and engrossed Senate Bill No. 2, marked Exhibit 'B,' and attached and filed herewith, may be taken as a true copy

of said endorsements as they appear upon the said original and engrossed Senate Bill No. 2.''

The Senate Journal shows that the House advised that it ''had taken up and passed Senate Bill No. 2, with amendments Nos. 1, 2 and 3 adopted, in which the concurrence of the Senate is respectfully requested.'' That journal also shows that the Senate took up each amendment separately and each is set out in full therein. Each was separately considered and adopted, and the bill, as amended, was then passed by the Senate. On the same day, July 8, 1919, the Governor signed the bill. The facts relating to the title are set out at another place.

I. Section 55 of Article IV of the Constitution reads:

''The General Assembly shall have no power, when convened in extra session by the Governor, to act upon subjects other than those specially designated in the proclamation by which the session is called, or recommended by special message to its consideration by the Governor after it shall have been convened.''

**The Word Recommend.**

The subject of capital punishment was not specially designated in the proclamation by which the extra session was called, and the question is whether the special message brought it before the General Assembly in a constitutional manner. The argument that it did not is founded upon the fact that the Governor did not use the word ''recommend'' which appears in Section 55 of Article IV. Counsel say: ''Note that the Governor in said special message does not use the words 'I recommend' or 'I advise you to pass such an act,' or 'there is a necessity for the passage of such an act;' he merely authorizes the General Assembly to take such action in the premises as it saw fit. It amounted to giving permission. . . . There is a vast difference between recommending that a thing be done and authorizing it or giving permission to do it.'' Dictionary definitions in harmony with the meaning of the word ''recommend'' thus indicated are quoted.

It is true that Section 55 of Article IV is a limitation upon the powers of the General Assembly in extra session and is mandatory. [Wells v. Railway, 110 Mo. l. c. 296, 297.] What it commands, however, depends upon what it means. The power it denies is the power to *act* upon any subject, unless that *subject* is designated in the convening proclamation or "recommended by special message to its consideration," etc. There is no implication that it is necessary for the Governor to favor one sort of act rather than another with respect to a subject he "recommends" by special message. "The General Assembly does not have to legislate upon the special matter just as the Governor may desire, or as he might indicate in an ill-advised message, but such body must confine itself to the matter submitted by the Governor. It cannot go beyond the matter submitted." [State ex rel. Rice v. Edwards, 241 S. W. (Mo.) l. c. 948.] The effect of this is to say that whatever action upon the subject the Governor may favor, the sole effect of his recommendation or submission is to bring that subject within the legislative power as a subject of legislation. This is the clear meaning of the section, since it is the "subject" alone which is required to be "recommended" before action be taken upon it. According to Webster's New International Dictionary the first meaning of the word "recommend" is: "1. To commit; to give in charge; to consign, command." A second meaning is like that contended for by counsel. The French word from which "recommend" is derived is defined as, "To commit, to intrust." As interpreted in the Edwards Case, this is the meaning the word "recommend" has in Section 55. The governors of the State who have called extra sessions have not been of the opinion that the use of the word "recommend" is essential to give efficiency to a special message submitting subjects of legislation to the General Assembly. The General Assembly, in extra session, has not proceeded on that theory. In a message to the extra session of 1895, Governor Stone, "called at-

tention" . . . to "a certain" matter for the pur-
pose of requesting and authorizing such legislation in
the premises as may be necessary. [Senate Journal,
Extra Session 1895, p. 88.] In the same message, with
respect to other subjects he used the language: "I now
submit to the General Assembly the question of providing
for these deficiencies by proper legislative enactment."
Under the first of these an act (Laws 1895, Extra Ses-
sion, p. 4) was passed adding a term of court in Carroll
County, and under the second an act was passed appro-
priating $12,000 to pay salaries of judges in the Eighth
Circuit and $3300 to pay for printing documents ordered
by the General Assembly.. In his messages to the extra
session of 1907, Governor Folk used the forms: "I here-
by submit for your consideration the subjects . . .;
or I submit for your consideration and action the sub-
ject," etc. [Senate Journal, Extra Session 1907, pp. 24,
25, 35, 46, 82.] Pursuant to one of these submissions, a
general appropriation bill was passed which carried near-
ly $4,000,000. Responding to another such authoriza-
tion (Senate Journal, Extra Session, 1907, p. 46) the
General Assembly enacted the miners' fellow-servant's
law. [Laws 1907, p. 251; sec. 4233, R. S. 1919.] At the
first extra session in 1921, Governor Hyde, on June 22,
1921, submitted twenty-five subjects for action. With
respect to three of these he "recommended" certain ac-
tion. In some cases he advanced arguments favoring
designated action and in one he argued against action,
but wrote that he submitted "this subject to you without
any recommendation of mine." In most instances he
simply stated, "I submit to you the subject of" this or
that. On July 11, 1921, the Governor submitted about
a dozen other subjects, using the same forms in about
the same proportions. In this message the Governor,
as in the other, argues for some propositions, submits
others without comment, and argues against one "sub-
ject" submitted. In State v. Rawlings, 232 Mo. l. c. 560,
Division Two of this court held that Section 2 of the

"Storing and Delivering" Act of 1907 was a proper subject for consideration and enactment under a sentence in the Governor's special message to the effect that "effective local option laws for counties, towns and cities should be enacted." The court alluded to this as a recommendation. Its effect was to commit to the General Assembly for action the subject mentioned. That body, under this submission, was authorized to deal with the subject of local option as it saw fit. It might have passed an act rendering such local option laws less effective. It could not be contended that such an act would have been invalid because out of harmony with the Governor's suggestion. [State ex rel. v. Edwards, supra.] Yet that would be the result of the theory for which counsel now contend, followed to its logical conclusion. The contention cannot be sustained.

II.    Section 30 of Article IV of the Constitution provides: "If a bill passed by either house be returned thereto, amended by the other, the house to which the same is returned shall cause the amendment or amendments so received to be printed under the same supervision as provided under the next preceding section, for the use of the members before final action on such amendments."

Printing Amendments.

(1)    In State ex rel. v. Field, 119 Mo. 593, amendments had been ordered printed, but there was no affirmative showing in the journal that they were printed. In discussing the question predicated upon these facts, the court said, at page 610:

Affirmative Showing by Journal.

"While it is not to be denied that an enactment may be overthrown by the recitals of the journal when it clearly appears the Constitution has been violated or ignored, still we do not think a mere failure of the journal to show every step required by the Constitution will necessarily render void the law. While it is provided the amendments shall be printed under the supervision of the engrossing committee, it does not require a report as in Section 29 to be made and spread on the journal.

When this bill was enrolled, and then signed in the presence of the House in open session, and all other business was suspended, we think we are bound, in the absence of a recital of the journal to the contrary, to presume that this condition precedent had been observed.

"It can hardly be presumed that the members of that house who voted against this bill were ignorant of the requirements of the Constitution and neglected to avail themselves of this means of defeating a bill to which they were opposed, or, on the other hand, that its friends would knowingly risk its rejection by neglecting such a simple precaution. The presumption in favor of the correctness of official action attends the action of the representatives of the people in the two houses of the General Assembly.

"This was the conclusion reached in State ex rel. v. Mead, 71 Mo. 272, and we see no reason for adding to, or departing from, what was so well said in that case, by the learned judge who prepared the opinion. [Supervisors v. People ex rel., 25 Ill. 181; People v. Dunn, 80 Cal. 211.] We accordingly hold that it must be presumed that the Constitution was obeyed and the amendments printed before final action thereon."

In that case the House had expressly ordered the printing done, but in that, and in this, the printing was ordered by the constitutional provision. The silence of the record in that case with respect to the fact of printing is not to be differentiated from the same silence in this case because of the order to print found in that case.

(2) It is argued that the facts in the stipulation affirmatively prove the amendments were not printed. No case is cited which holds that a law may be invalidated by evidence other than entries in the regular journals of the House. The effort here is to show by oral testimony that there is no record proof that the amendments were printed.

Silence of Journal: Oral Testimony.

It is not contended the journal makes any affirmative showing. It is silent except in so far as an

inference may be based upon the fact of the consideration of the amendments and upon a further silence— the absence of protest under Section 37, Article IV. In the majority opinion in State ex rel. v. Drabelle, 261 Mo. 515, it was ruled that a law may be held invalid when the *journal* shows affirmatively that an essential constitutional requirement has not been met. That rule does not authorize resort to oral evidence to contradict the journal or to prove that a step required, but not required to be entered in the journal, was not taken. The rule contended for in the dissenting opinion in that case is that courts may not go back of the enrolled bill. It is apparent this rule would not let in evidence like that offered here. Neither rule supported in that case avails in this. The difference of opinion in that case is indicative of that in the courts of the country. A rule like that contended for would render legislation insecure and remit it to the courts to try its validity on questions of constitutional procedure on the testimony of witnesses. The doctrine is not supported by either reason or authority.

III. It is argued that because the journals do not in every instance set out the full title of Senate Bill No. 2 in the entries which on their faces show that the bill was read as required, invalidates the act. Journal Identification of Bill. It is not and could not be claimed that the entries do not contain ample matter to identify Senate Bill No. 2 as the bill to which journal entries refer. The Constitution required the bill to be read. The journal entries clearly identify it in each instance and show it was read. It is not required that each journal entry contains the full title. In such circumstances the objection made is not sound. Nor is it required that a bill must have at all stages of its progress the same title. It is not asserted the title as finally adoped is insufficient. "There is nothing to show such a change in the title as would mislead the Legislature as

to the subject of the act" (State ex rel. v. Field, 119 Mo. l. c. 609), and, therefore, the act is not to be held invalid for the reason assigned.

IV.   It is urged that reading a bill on Sunday is equivalent to failing to read it at all and, as a consequence, Senate Bill No. 2 was not passed in a constitutional manner.   The question is whether an act of legislation performed by the General Assembly on Sunday is a nullity. It is not contended there is anything in the Constitution which expressly forbids legislative action on Sunday, nor even that any specific statutory provision of that kind exists.   Counsel say they have been unable to find a decision on the point.   It is argued that Sunday is *dies non* so far as courts are concerned; that work and labor and many other things are prohibited on that day; and that it must be inferred that the framers of the Constitution had in mind secular days when they provided that all bills should be read on three separate days in each house.   The question is not whether the General Assembly ought to perform any of its duties on Sunday, nor whether it ought to be prohibited from doing so. The question is whether it is prohibited from doing so and whether all legislative action on that day is a nullity.   That such action is offensive to sentiment in the State may be conceded.   Is it forbidden?   The common law, with certain qualifications, was put in force in Missouri in 1819.   [Sec. 7048, R. S. 1919; Lindell v. McNair, 4 Mo. 380.]   Under that law judicial acts were not permitted on Sunday but "as to all other acts it made no distinction between Sunday and other days of the week." [Said v. Stromberg, 55 Mo. App. l. c. 441, citing 2 Parsons on Contracts (7 Ed.) 757, notes n. and cc.]   This is generally held.   [Swann v. Broome, 3 Burr. l. c. 1598; Story v. Elliot, 8 Cowen, 27; Merritt v. Earle, 31 Barb. l. c. 41; Drury v. Defontaine, 1 Taunt. 131; Rex v. Brotherton, 2 Stra. 702; Heisen v. Smith, 138 Cal. l. c. 218, citing 2 Bouvier's Law Dict. "Sunday"; Southern Ry. v. Wallis, 133 Ga. l. c. 555; Boynton v. Page, 13 Wend. l. c.

429; 37 Cyc. p. 545; 25 R. C. L. pp. 1413, 1414.] The Constitution contains no prohibition which is invoked on this question. The statutes respecting Sunday are valid (State v. Ambs, 20 Mo. 214), but no one of them has any special reference to the prohibition of legislative action on Sunday, even if it be assumed one Legislature might restrict another with respect to its activities as a legislative body by an act imposing penalties upon its members. The General Assembly is a separate magistracy. Among the almost innumerable decisions upon the question what acts fall within the prohibitions of statutes more or less like ours (Sec. 3596, et seq., R. S. 1919) there is none in which it is attempted to apply such provisions to punish a member of the Legislature for acting in his official capacity on Sunday, or to apply it to render void an act of legislation because some step in its passage was taken on Sunday. There is much conflict in the decisions of the country concerning the limits of the scope of such statutes, though there is general agreement as to their validity and as to their general effect. In such circumstances if the statute is relied upon, it ought to be a plain case before this court should say to a co-ordinate magistracy that its work was done out of time. Lord Mansfield remarks in one case that he had sat in Parliament on Sunday. Mr. Cushing in his "Law and Practice of Legislative Assemblies," secs. 356, 357, p. 145, says:

"A legislative assembly, having once met, either with or without a quorum, on the day appointed for its meeting, continues to meet afterwards regularly, and as a matter of course, every legislative day, that is to say, every day, except Sundays and such other days (as, for example, in England, Christmas and Good Friday) as, by the law and usage of each particular state, are accounted as holidays. But though these days are not legislative, on which an assembly meets, as of course, or on which it would meet unless otherwise ordered, they may nevertheless be made legislative days by the assembly

299 Mo.—26.

itself.   Thus, if the assembly sits over from the day preceding, or appoints them beforehand for a meeting, they then become legislative days.   In the eastern, and, probably in some of the other states, Sunday is the only day which is not an ordinary legislative day, and on which legislative assembly does not meet, as a matter of course.

"Sundays, and the other days above mentioned, being legislative days or not, according to the determination of the assembly, they are always reckoned as a part, or so many days of, the session; thus, for example, the members draw their daily pay for these as much as for any other days; and when it is provided by constitution, that neither house shall adjourn for more than a given number of days, without the consent of the other, that the executive shall return a bill within a certain number of days; these days are included in the computation; but where the rules of an assembly require that certain motions, as, for example, the motion for reconsideration, shall be made within a fixed number of days, Sundays and the other days above mentioned are included or not in the computation, according as the assembly sits or not on those days."

In State ex rel. v. Auditor, 37 Mo. 176, this court quoted with approval a part of Section 357.   Cushing's citations show both houses of Congress have held sessions on Sunday, and reference to these citations so far as available, discloses that the objections made at the time were not to the legality of the session, but to the morality of the act of holding it.

In one of these citations (6 Cong. Globe, p. 371) it appears that all seemed to concede that the House lawfully could sit on Sunday and that the question of the necessity of such a sitting could be determined by that body.   In another citation, at page 245 of the 7 Cong. Globe, it is shown that the Senate adjourned at four a. m. Sunday until ten a. m. of that day and met at that time. The heading is "Sunday, March 3, 1839."   At page 248

a meeting of the House is shown under date of "Sunday, March 3, 1839."

Even if in such a state of the decisions and in view of the practice and holdings cited it ordinarily could be held that legislative action was work within the meaning of the section cited, and that the section applied to the members of the Legislature in the performance of their duties as such, and that the effect of the section would ordinarily be to nullify action on Sunday, the question whether the work was one of necessity would remain. The judgment of the General Assembly on this feature ought to have weight. The resolution adopted indicates its belief that the act in question was necessary to check a wave of crime and lawlessness. No general definition of "necessity" can be given. "The question must be determined according to the particular circumstances of each case, having regard also to the changing conditions of civilization. In general, it may be stated that although by the word "necessity" is not meant a physical and absolute necessity, it does mean something more than merely needful and desirable, and generally involves considerations of moral fitness and propriety. There must be at least a moral emergency which will not reasonably admit of delay, but is so pressing in its nature as to rescue the act done from the imputation of a wilful desecration of a day sacred for certain purposes in morals as well as in law. And generally speaking it ought to be an unforeseen necessity, or, if foreseen, such as could not reasonably have been provided against." [25 R. C. L. pp. 1421, 1422.]

The fact that the emergency clause was not passed is no answer, since that seems to have been due to the small attendance at the extra session more than anything else. That the action on Sunday advanced the act but one day is true, but the General Assembly deemed that of consequence.

The contention of counsel which has just been considered rests upon the assumption of the soundness of

the majority opinion in State ex rel. v. Drabelle, 261 Mo. 515. If the dissenting opinion in that case is correct, the present contention has nothing to support it, since, according to that dissent, the journal cannot be examined at all. The rejection of the principle contended for in the dissent mentioned is necessary before the question concerning the legislative right, or power, to transact business on Sunday can get into this case. What has been said upon that question necessarily rests upon the assumption, for argument's sake, that the majority opinion in the Drabelle Case is right. The intent is not to re-open that controversy, though the briefs discuss it, nor to decide again that question, but to show that whatever view is taken of it the result must be the same. The dissent in the instant case of necessity involves a rejection of the principle of the dissent in the Drabelle Case, as well as a rejection of the reasons advanced to show that though it be assumed that the majority were right in the Drabelle Case, nevertheless the law reaches the same result in this case. We hold that the reading of the bill on Sunday, whatever view may be taken of the propriety or morals of the action, cannot be held a nullity under our law as it now stands.

It results from this and what is said in preceding paragraphs that the petitioner must be remanded. All concur except *Graves, J.*, who dissents in separate opinion.

GRAVES, J. (dissenting).—I am constrained to dissent in this case. I concur, however, in all of the opinion except paragraph four and the result reached. My dissent must, as a matter of course, center upon the questions ruled in this paragraph of the opinion. Of these matters in order.

I. In the modified opinion now before me, in speaking of the majority opinion in State ex rel. v. Drabelle, 261 Mo. 515, it is said: "The intent is not to *re-open* that

controversy, though the briefs discuss it, nor to decide again that question, but to show that whatever view is taken of it the result must be the same." I did not agree to that opinion, and for reasons stated in my dissenting opinion in that case, 261 Mo. l. c. 524, and in State ex rel. v. Seibel, 262 Mo. l. c. 228. The case was reviewed in 15 Columbia Law Review, 285. In this review (speaking of the majority opinion in Drabelle's Case) it is said:

"The duty of the courts to pass on the constitutionality of legislative acts has been interpreted in many jurisdictions to include the necessity of looking behind enrolled bills to see that the legislators have, in their procedure, complied with constitutional requirements. [Opinion of the Justices (1858), 35 N. H. 579; Rode v. Phelps (1890), 80 Mich. 598; State v. Nashville Baseball Club (1913), 127 Tenn. 292.] But the opposite view has been taken in a very strong line of decisions, which refuse to subject a law, publicly proclaimed and acted upon, to the danger of being undermined by evidence from a carelessly compiled journal. [Pacific Railroad v. Governor (1856), 23 Mo. 353; Ex parte Wrenn (1886), 63 Miss. 512; State v. Wheeler (1909), 172 Ind. 578.] *The better reasoned cases recognize the judicial duty to see that constitutional requirements are observed, but accept the solemn assurance of the governor and presiding officers of the Legislature* as unimpeachable evidence of the proceedings of the co-ordinate branches of government. [Field v. Clark (1892), 143 U. S. 649; Lafferty v. Huffman (1896), 99 Ky. 80; Atlantic Coast Line Railroad v. State (1910), 135 Ga. 545.] Even the decisions upon which the decision in the principal case is based recognize a strong presumption in favor of the regularity of the enrolled bill, which would not be sufficiently rebutted by doubtful evidence in the journal. [State v. Frank (1901), 61 Neb. 679; Missouri Ry. v. Simons (1907), 75 Kan. 130; Goff v. Rickerson (1911), 61 Fla. 29.] The principal case, in allowing conflicting evidence from the journals to impeach an enrolled bill, seems to give very little weight to this presumption."

In the present case, when the majority of this court says "the intent is not to *re-open* that controversy nor to *decide* again that question" it is an approval of the majority opinion in Drabelle's Case. A refusal to re-open a question previously decided by this court, is in legal effect an approval of the previous ruling. In this instance the approval of the majority opinion in Drabelle's Case is by six of the seven members. Even the support which I had in the dissent in the Drabelle and Seibel cases has left me. I did not then, nor do I now, agree to the views of the majority opinion in Drabelle's Case, but it is the law of this State until overruled. In the present case the majority of the court declines to re-open the question there decided. This opinion again reiterates the rule in Drabelle's Case. If that rule be the law, the present opinion does violence to the rule. There we ruled that an enrolled bill could be impeached by the entries upon the journal of the House, and that the matter was a question for the courts. In the instant case one reading of the bill was upon Sunday, and the legislative record so shows. Under the Drabelle Case the enrolled bill can be impeached by such evidence, and it is a matter for court determination, notwithstanding the provisions of Sections 37 and 38 of Article IV of the Constitution.

It is made clear by Drabelle's Case that if there were but two legal or lawful readings of the bill, and such was shown by the record, then the law never was enacted in the manner pointed out by the Constitution, and therefore invalid. In other words, if a reading upon Sunday was no reading (the reading upon Sunday being shown by the legislative records) then the law is invalid. This because six members of the present court have given the majority views in Drabelle's Case the stamp of their approval.

II. The majority in the present case adhering, as is done by the opinion, to the majority views in Drabelle's Case, supra, reach the result by ruling that al-

though the legislative record shows one reading upon Sunday, such day is a legislative day within the meaning of Section 26 of Article IV of the Constitution, which says, "and every bill shall be read on three different days in each house."

The force of their argument is, that the Constitution does not say to, the Legislature, "You shall not meet upon Sunday," and therefore Sunday is a legislative day just as are the six secular days of the week. Up to the enactment of this measure the Constitution has never been so construed by our law-makers. There have been sessions upon Sunday, which we know as a matter of history, but no legislative record of such Sunday service, so far as we can find. What was done on Sunday appears upon Saturday's record, and that kind of a record cannot be impeached. If Sunday is a legislative day in Missouri, it remained for the enactment of the law involved here to develop that fact. Never before had a Missouri Legislature deliberately adjourned over from Saturday to Sunday for legislative work upon Sunday. The mere fact that *per diem* has been paid for a day upon which that body did not ·actually work argues nothing. The fact that such body never before, by record entry, convened upon Sunday, argues much as to the legislative construction of the Constitution. The question is not so much whether or not the Legislature is or is not prohibited (by the Constitution) from making laws upon Sunday, as it is, to what days the framers of the Constitution had in mind, when they said " and every bill shall be read on three different days." If they meant that Sunday should be counted a day for the making of laws in Missouri, then the majority views are correct. On the other hand if we give to the language its ordinary and usual import, we·could not say that the framers of the Constitution of 1875 intended to say that Sunday was to be a legislative day in Christian Missouri. Had the Convention drafting the Constitution of 1875, written into that instrument what the majority rules is in fact now in

it, i. e. that Sunday shall or *may* be a day for legislative work, the instrument would never have been adopted. Did the people who promulgated the organic law mean to say that Sunday was a working day for the Legislature of Missouri? Did they mean to say, when providing for the three separate readings of bills, one reading may be had upon Sunday, at a session duly held upon that day? We do not believe that such was ever the intent of the framers of the Constitution, nor of the people who adopted it. The words used in Section 26 of Article IV mean upon three secular days, and not otherwise. Sunday has never been considered a legislative day in Missouri. The public policy of the State from the day of its admission into the Union to the present condemns the idea of having Sunday as a legislative day in Missouri. By legislative day, I mean a day upon which the Legislature either *may* or *must* work. The Constitution must be given a reasonable construction. It is either certain or uncertain whether the Constitution intended Sunday as a legislative day in the use of the words found in Section 26 of Article IV. If certain, and the language is unambiguous, upon this point, then in construing it extraneous matters are not for consideration. If uncertain the extraneous matters can be considered.

The rule was succinctly stated in the early case of Hamilton v. St. Louis County Court, 15 Mo. l. c. 23, whereat it is said:

"If there be in the Constitution any language of doubtful import, we must, of course, look to the circumstances and condition of the people, and to the history of the instrument itself, to find the meaning of the clause in question; but where the language is plain and intelligible, and consistent with all other parts of the instrument, we cannot allow ourselves to find, in any reference to facts, out of the instrument, any authority for interpolating either a grant of power or a restriction upon power granted."

The Constitution is silent upon the matter as to whether or not Sunday is or is not a legislative day. It therefore is a matter of uncertainty as to whether or not the language of Section 26 of Article IV includes Sunday. In such case we can look to the circumstances and conditions of our people at the time the Constitution was adopted. Not only so, but the public policy of the State as it then existed is important, and this we may consider. Sunday was a day of rest and not of work under the public policy of Missouri at the adoption of the present Constitution. Such is the public policy of the State now, and such it was from the beginning. With this sidelight it cannot be said that the people intended to make Sunday an ordinary work day so far as law-making is concerned. The present opinion (not in open language, but in legal effect) so rules. It even hints that the legislator should not draw his pay for Sunday, if he does not work. This because it is urged that the Legislature recognizes Sunday as a legislative (working) day, because the members draw their pay for that day.

The Constitution, like statutes, must be considered under that rule which requires the courts to reach the real intent of the framers (the people) in giving meaning to the language up for construction. No man can read the history of this commonwealth, and say that her people, in 1875, intended to say that her legislative body must or *may* make her laws upon Sunday. A suggestion of such a thing would have been repudiated then as it would now. A constitutional convention is now in session. Let it put therein language making Sunday a legislative day, and their instrument will meet certain defeat at the polls.

If Sunday is, in law, a legislative day for the law now under review, it is such for all legislative purposes and for all laws. Our Constitution contemplates no such thing. The language used in Section 26, Article IV, has reference to secular days and not to Sunday. If so, there were but two constitutional readings of the bill, as ap-

pears from the legislative record, and the law is void under the Drabelle and Seibel cases, supra, which cases have now met with the approval of all the members of this court, except the writer. Without the overruling of those two cases this law, now under consideration, is void.

Something is said in the majority opinion about there being a necessity for action upon Sunday. It is not made the basis of a ruling, and could not well be made an excuse for the legislative act in this case. A mere delay of a day in passing this law could not have invoked the doctrine of taking the ox out of the ditch upon Sunday. The suggestion in brief and in opinion deserves no further notice. I therefore dissent.